**Thomas R. BRAZIL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 78–X–0323–S.

United States District Court, N. D. Alabama, S. D.

Dec. 14, 1979.

R. Gordon Pate and Alex W. Newton, of Hare, Wynn, Newell & Newton, Birmingham, Ala., for plaintiff.

J. R. Brooks, U. S. Atty., Ann C. Robertson, Asst. U. S. Atty., Birmingham, Ala., for defendant.

## OPINION IN LIEU OF FORMAL FINDINGS AND CONCLUSIONS

GROOMS, District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C. § 1346, by plaintiff, Thomas R. Brazil, against the United States for injuries suffered as a result of the alleged negligent failure of the Veterans Administration Hospital (VAH) in Birmingham, Alabama, acting through its agents, servants and employees, to diagnose and treat plaintiff's fractured spine on May 21, 1977. More specifically, plaintiff claims that VAH failed to: (1) diagnose his back condition; (2) properly read the X-rays; and (3) take proper X-rays, and negligently: (1) discharged him without giving him proper instructions regarding back pain; (2) ignored his complaints of severe back pain; and (3) failed to admit him to the hospital and to immobilize him in accordance with accepted standards of good care for a person with a severe back injury.

Plaintiff, 53 years of age at the time, was involved in a head-on collision near Bir-

mingham during the evening of May 21, 1977. After he was extricated from the car, which he was operating, he was brought by ambulance to the VA Hospital around 8:30 or 9 p. m. There is a sharp dispute in the evidence as to whether he was intoxicated. He conceded that he had consumed four, five, or six cans of beer during the day of the accident. He was dazed. His memory returned at the VA Hospital. He does not remember the examination at the hospital, nor has he any recollection of any combativeness while there.

Dr. Paul Shanker, a senior medical resident specializing in internal medicine, was the Officer of the Day and on duty when the plaintiff was brought in. According to Dr. Shanker all his complaints actually focused on back pain, and he considered the plaintiff a major trauma patient. He sent him to X-ray and called in Dr. Richard Stuhr, surgical officer of the day, as a consultant. Dr. Stuhr, was in his first year of residency. Dr. Shanker ordered a skull series, a chest X-ray (a.p. & lat.), lumbar spine and cervical spine X-rays. No thoracic (dorsal) spine X-ray was ordered. It was in the thoracic spine that the fracture had occurred. Drs. Shanker and Stuhr found an arthritic condition known medically as ankylosing spondylitis, or "bamboo spine." That condition conceivably would have rendered the spinal column more liable to fracture. The posterior-anterior and lateral views of the chest reveal the thoracic spine from those views. Plaintiff's chief complaint in respect to the X-rays is the failure to take a p.a. picture of the thoracic spine, which he contends would have clearly shown the fracture. Drs. Shanker and Stuhr did not find the fracture on the X-rays which were taken. Those X-rays, on later examination, reveal the fracture, although not very distinctly. Drs. Shanker and Stuhr undertake to explain the failure to take the thoracic view on the uncooperative conduct of the plaintiff.

Although both doctors had had some neurological and orthopedic training in medical school, neither had specialized in either field. Orthopedic and neurological consultation was available at the hospital on a 24-hour a day and 7-day a week basis.

It is the standard and accepted practice in trauma cases for the examining physician to palpate the area of suspected injury or fracture to determine the response to pain that might point to the location of an injury. The medical records do not record any such palpation although both doctors now testify that they did palpate the thoracic area.

Plaintiff was not admitted to the hospital, but was discharged and left shortly after midnight. He walked to a car with the assistance of his son and another and was taken to his ex-wife's home. Before leaving the hospital those accompanying him were told to wake him every hour after he had gone to sleep and to ask him questions to determine whether he was coherent. The lack of coherence would indicate brain damage. They were to contact the hospital in the event of any such symptoms.

Plaintiff continued to suffer a great deal of back pain and complained often of the presence and severity of such pain. The next day he went to the University Hospital emergency room across the street from the VA Hospital seeking relief. He was under examination for about one hour by Dr. Alexander Nading, who took no X-rays of his back but testified that he palpated his back and that there was no apparent tenderness of the back as indicated by the fact that he didn't record any. Plaintiff returned to his ex-wife's home. He began losing the feeling in his legs and was walking with difficulty. He returned to the VA Hospital on the 24th. When X-rays were taken of the thoracic spine, they revealed a sharp subluxation, or displacement, of 9T. He lacked reflexes in his legs, but could move them and could walk. An operation was indicated but was not performed at that time because of an irregular heart condition. He was given steroids to reduce the swelling in the spinal cord. Dr. Ricardo Brau, the attending physician, told him that he had a fractured spine, that he should lay flat on his back, and that if he moved he could become a paraplegic. Notwithstanding the

warning of the doctor and the attending nurse, he continued thrashing around significantly more than the average patient. He would sit up and on one occasion got out of the bed and cranked the bed to change its position. By the 29th his condition had materially grown worse. Both legs were paralyzed. An X-ray revealed that the fracture had realigned itself. A laminectomy was performed on that date, and Harrington pins were installed to maintain the alignment and to stabilize the spinal column. The pins remained in place until removal on February 12, 1979.

The medical testimony revealed that the displaced bone could move in and out of displacement as a result of movement, that such movement could injure the cord, that symptoms of injury would appear immediately or within a few hours, and that the change manifested on the 29th was probably related to the movement of the plaintiff.

Feeling has returned to his right leg and functional control has returned to that leg, but not the left. He can stand with support and can walk moderate distances (80 to 100 feet) with a walker. The prognosis is that his right leg will continue to improve, that the long leg brace on his left leg with which he was fitted at the Memphis VA Hospital can be replaced with a short leg brace, which will enable him to walk with limitations. His ankylosing spondylitis has caused him pain for many years prior to the accident, and his walking is made more difficult because of that condition, since due to that condition he has a spine that has no movement within it from the hips up to his head. That fact cuts down on his balance or his ability to swing his legs through, and adds to his general instability.

His medical diagnosis is that of paraparesis, or partial paralysis of the lower extremities, and not paraplegia, or total paralysis.

Plaintiff left the VA Hospital on June 16, 1977. Between that date and the date of the trial, he was in the Memphis VA Hospital on two occasions, in the Spain Rehabilitation Hospital in Birmingham on two occasions for therapy, and in the VA Hospital when the rods were removed. Since then he has been back to the VA Hospital in Birmingham on an out-patient basis up until the time of discharge.

Plaintiff went into the Army in 1943, and was in the invasions in Africa, Sicily and on Omaha Beach. He was discharged as a Sargeant in 1945. He reenlisted and went to Korea and Vietnam, and was discharged as a Major in 1966. He went back to Vietnam as a civilian for 18 months to run a supply depot. He then went to Saudi Arabia where he trained Saudi troops for a year.

Plaintiff was discharged from the Army with a 60% disability rating. He went to work for the City of Birmingham in 1972, and from 1973 to the date of the accident was a heavy duty equipment operator. His salary with the City at the time of the accident was $440.40 each two weeks. The pay scale at the time of the trial was $502.40 every two weeks. He receives retirement benefits of $572.00 per month and disability benefits of $387.00 per month, after taxes.

The Alabama Code, § 6–5–484, prescribes the duty of care owed to patients by physicians, surgeons, dentists, and hospitals, and is as follows:

"(a) In performing professional services for a patient, a physician's, surgeon's or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill and diligence used by hospitals generally in the community."

This section appears to be a codification of the case law of this state. *Watterson v. Conwell*, 258 Ala. 180, 61 So.2d 690; *Orange v. Shannon*, 284 Ala. 202, 224 So.2d 236.

▌ I am of the opinion and so hold that the testimony of Dr. Richard Warren Levy, a physician practicing in New Orle-

ans, Louisiana, in those aspects wherein he gives an opinion as to the standards of care owed by physicians and hospitals in the Birmingham neighborhood and community is not admissible based upon his qualifications to so testify. *Mills v. Levy*, 537 F.2d 1331 (5th Cir.), and *Koch v. Gorrilla*, 552 F.2d 1170 (6th Cir.) Consequently, the Court is not considering such testimony. The Court is of the opinion and so holds from all other evidence that the doctors at the VA Hospital who attended plaintiff on the night of May 21, 1977, did not exercise the care required of them under the law above quoted in certain particulars, namely, they failed: (1) to order direct thoracic X-ray views of the plaintiff's spine which would have disclosed the fracture, notwithstanding the fact that plaintiff was considered a major trauma case and made continuous complaints of pain in his back; and failed (2) to conduct a complete examination specifically with respect to the palpation of the back. The hospital records do not disclose any examination in that particular, although that was an important record to make. They also failed (3) to admit him to the hospital or at least to hold him for observation. As noted, experts in the fields of neurology and orthopedics were available to them at all times for consultation. Nevertheless, they sent him away after some two or three hours without such consultation, and without any instructions in regard to care of a back injury such as he had sustained, and of which he gravely complained, leaving him in ignorance as to the damage to the spinal cord that could result from movement of the body.

When the plaintiff returned to the VA Hospital on May 24th, his condition had deteriorated to some extent. There was a decrease in pinprick sensation in his extremities and his reflexes were absent at the knee and ankle area. There was some neurological deficit, but he could walk and from a motion point of view his strength in his extremities was described as "excellent." It was normally expected that he would be able to ambulate if the fracture was corrected. A neurological examination was made each day, and his condition was found to be unchanged neurologically from the 24th through the 28th of May. He still had numbness but power in his lower extremities was again found to be "excellent." On the 29th he was much weaker in his lower extremities. There was a rapid deterioration and severe impairment. Immediately following such finding a laminectomy was performed and the rods inserted even though the heart condition continued.

Upon plaintiff's admission to the hospital on the 24th, the attending physician prescribed absolute bed rest in a flat position. It was important that he not move since all the motion in his spine was going to occur at the fracture site for the reason that all the other spine was rigid from the ankylosing spondylitis. The nurse's notes on that day reflect that he was uncooperative regarding doctor's orders, that he was trying to sit up, and turning from side to side. The nurse explained his condition to him and the doctor's orders. She recorded that they were unable to catherize him, that he would not lie on his back. The doctor was notified and warned him of the probable dire consequences of movement. Following that date the bedside notes do not record any movements by the plaintiff, but the condition found to exist on the 29th confirms the fact of such movement. It is undisputed from the medical testimony that motion could cause injury to the spinal cord and that symptoms would appear immediately or within a few hours. The prevention of motion and resulting injury is the primary reason for immobilizing the spinal column following a fracture such as the plaintiff sustained.

The Court is of the opinion and so finds that plaintiff's disobedience to orders in respect to movement, which operated upon the consequences of the prior negligence of the physicians, contributed to the condition which suddenly appeared on the 29th, and materially increased his injury and resulting damage.

The rule is stated in 70 C.J.S. Physicians and Surgeons § 51, at 974, note 10 and supplement, that:

"Where liability for negligence or malpractice has been incurred by a physician, subsequent negligence of the patient, which aggravates the injury primarily sustained at the hands of the physician, does not discharge the latter from liability, but only goes in mitigation of damages."

It is the duty of the patient to cooperate with his physician and to follow all proper instructions given him. *Id.* § 51(b)

The Court finds that the plaintiff was not guilty of contributory negligence with respect to what happened at the VA Hospital on the night of May 21st. Among other things it may be reasonably assumed that he was under considerable stress and in shock from pain so soon after the head-on collision. Nothing however that happened that night can relieve him of such part of his injury and damages as was proximately caused by the avoidable consequences of conduct on his part subsequently occurring. The rule in this respect is very cogently and explicitly stated by Judge Brown speaking for the court in *Southport Transit Co. v. Avondale Marine Ways, Inc.*, 234 F.2d 947 (5th Cir.), at 951, et seq., as follows:

"[T]he principle applicable is not the ordinary one of contributory negligence which relates to the use of due care to avoid the happening of the event (here the fire) giving rise to the initial harm. Rather it is, or is akin to, the one universally applied for both torts and contracts, generally described as the doctrine of avoidable consequences and under which a plaintiff, with an otherwise valid right of action, is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them. The contrast is most vivid in contemplating a traditional common law situation. 'If the plaintiff by negligent action or inaction *before* the defendant's wrongdoing has been completed has contributed to cause actual invasion of plaintiff's person or property, the plaintiff is wholly barred of any relief. The doctrine of avoidable consequences comes into play at a later stage. Where the defendant

has already committed an actionable wrong, whether tort or breach of contract, then this doctrine limits the plaintiff's recovery by disallowing only those items of damages which could reasonably have been averted * * * contributory negligence is to be asserted as a complete defense, whereas the doctrine of avoidable consequences is not considered a defense at all, but merely a rule of damages by which certain particular items of loss may be excluded from consideration * * [emphasis the author's], McCormick on Damages, West Publishing Company, 1935, Chapter 5, Avoidable Consequences, pages 127 et seq.; see also 61 Harvard Law Review (1947), 113, 131–134, Developments in Damages. Recognized universally, it is nonetheless understandable that variable conceptual explanations are given ranging from contributory negligence, as such, lack of proximate cause and a so-called 'duty' to mitigate."

The decision is buttressed by numerous cases detailed in the footnotes.

The application of the rule is illustrated, but not so named, in *Louisville & Nashville Railroad Co. v. Hine*, 121 Ala. 234, 239, 25 So. 857, 860, where a party was ejected from a train, but was shortly thereafter invited to reboard but refused to do so unless the train was backed to him for reboarding. He sought damages in respect to the failure of his journey. The court ruled that:

"While by refusing such offer the plaintiff did not forfeit his right of action for the ejection, he could not be allowed to aggravate his injury or to enhance his damages by a voluntary abandonment of the trip. On the contrary, it was his legal duty to use ordinary care to make his damage no greater than was necessary, and to adopt reasonable and convenient means to that end; and the application of that rule would certainly have required of plaintiff his return to the train, if the accomplishment of the journey was important."

The Court concludes and finds as follows:

(1) That the physicians attending the plaintiff on the night of May 21, 1977,[1] were guilty of negligence in the particulars hereinabove indicated, that such negligence proximately contributed in part to his injury and damages, and that they were acting in line and scope of their employment at that time as servants, agents, or employees of the Veterans Administration, an agency of the defendant, United States.

(2) That plaintiff was not guilty of contributory negligence that proximately contributed to his injury and damages at that time and on that occasion; but

(3) That the plaintiff's acts and conduct as above detailed following his admission to the VA Hospital on May 24, 1977, operating upon the consequences of the prior negligence of the physicians, proximately contributed in part to his injury and damages and subjected him to the application of the avoidable consequences rule.

▪ Plaintiff is 55 years of age. He is totally disabled. His life expectancy extends beyond his retirement age of 65. He has lost, and will lose up to age 65, future wages in the sum of $159,265.00. With due consideration for the pain and suffering and disability from his pre-existing ankylosing spondylitis and from the accident itself, the Court finds that his damages for pain, suffering and disability were enhanced by the sum of $150,000.00 as a proximate cause of the defendant's negligence and by his own conduct in the time and manner herein detailed. The Court attributes 55% of his total increased damages to his own conduct, and 45% to that of the defendant.[2] A judgment will be entered in plaintiff's favor for $140,000.00.

---

1. It is not claimed that there was negligence on any other date.

2. There is of course no actual yardstick to measure pain and suffering. The determination of the damages for such rests in the sound discretion of the trier of the facts based upon all the evidence. This is not a comparative negligence case, but the Court sees no more difficulty in a determination and apportionment of damages than that experienced by the trier of facts in a comparative negligence case based upon the percentage of negligence of the defendant and the contributory negligence of the plaintiff in such a case.