ELEANOR OSTROWSKI, PLAINTIFF-APPELLANT, v. LYNN M. AZZARA, D.P.M., DEFENDANT-RESPONDENT.

Argued March 28, 1988—Decided August 11, 1988.

430

*Hanan M. Isaacs* argued the cause for appellant (*Felmeister & Isaacs,* attorneys).

*John W. O'Farrell* argued the cause for respondent (*Francis & Berry,* attorneys; *Susan R. Rubright,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This case primarily concerns the legal significance of a medical malpractice claimant's pre-treatment health habits. Al-

though the parties agreed that such habits should not be regarded as evidencing comparative fault for the medical injury at issue, we find that the instructions to the jury failed to draw the line clearly between the normal mitigation of damages expected of any claimant and the concepts of comparative fault that can preclude recovery in a fault-based system of tort reparation. Accordingly, we reverse the judgment below that disallowed any recovery to the diabetic plaintiff who had bypass surgery to correct a loss of circulation in a leg. The need for this bypass was found by the jury to have been proximately caused by the physician's neglect in performing an improper surgical procedure on the already weakened plaintiff.

I

As noted, the parties do not dispute that a physician must exercise the degree of care commensurate with the needs of the patient as she presents herself. This is but another way of saying that a defendant takes the plaintiff as she finds her. The question here, however, is much more subtle and complex. The complication arose from the plaintiff's seemingly routine need for care of an irritated toe. The plaintiff had long suffered from diabetes attributable, in unfortunate part perhaps, to her smoking and to her failure to adhere closely to her diet. Diabetic patients often have circulatory problems. For purposes of this appeal, we shall accept the general version of the events that led up to the operation as they are set forth in defendant-physician's brief.

On May 17, 1983, plaintiff, a heavy smoker and an insulin-dependent diabetic for twenty years, first consulted with defendant, Lynn Azzara, a doctor of podiatric medicine, a specialist in the care of feet. Plaintiff had been referred to Dr. Azzara by her internist whom she had last seen in November 1982. Dr. Azzara's notes indicated that plaintiff presented a sore left big toe, which had troubled her for approximately one month, and calluses. She told Dr. Azzara that she often suffered leg

cramps that caused a tightening of the leg muscles or burning in her feet and legs after walking and while lying in bed. She had had hypertension (abnormally high blood pressure) for three years and was taking a diuretic for this condition.

Physical examination revealed redness in the plaintiff's big toe and elongated and incurvated toenails. Incurvated toenails are not ingrown; rather, they press against the skin. Diminished pulses on her foot indicated decreased blood supply to that area, as well as decreased circulation and impaired vascular status. Dr. Azzara made a diagnosis of onychomycosis (a fungous disease of the nails) and formulated a plan of treatment to debride (trim) the incurvated nail. Since plaintiff had informed her of a high blood sugar level, Dr. Azzara ordered a fasting blood sugar test and a urinalysis; she also noted that a vascular examination should be considered for the following week if plaintiff showed no improvement.

Plaintiff next saw Dr. Azzara three days later, on May 20, 1983. The results of the fasting blood sugar test indicated plaintiff's blood sugar was high, with a reading of 306. The urinalysis results also indicated plaintiff's blood sugar was above normal. At this second visit, Dr. Azzara concluded that plaintiff had peripheral vascular disease, poor circulation, and diabetes with a very high sugar elevation. She discussed these conclusions with plaintiff and explained the importance of better sugar maintenance. She also explained that a complication of peripheral vascular disease and diabetes is an increased risk of losing a limb if the diabetes is not controlled. The lack of blood flow can lead to decaying tissue. The parties disagree on whether Dr. Azzara told plaintiff she had to return to her internist to treat her blood sugar and circulation problems, or whether, as plaintiff indicates, Dr. Azzara merely suggested to plaintiff that she see her internist.

In any event, plaintiff came back to Dr. Azzara on May 31, 1983, and, according to the doctor, reported that she had seen her internist and that the internist had increased her insulin and

told her to return to Dr. Azzara for further treatment because of her continuing complaints of discomfort about her toe. However, plaintiff had not seen the internist. Dr. Azzara contends that she believed plaintiff's representations. A finger-stick glucose test administered to measure plaintiff's non-fasting blood sugar yielded a reading of 175. A physical examination of the toe revealed redness and drainage from the distal medial (outside front) border of the nail, and the toenail was painful to the touch. Dr. Azzara's proposed course of treatment was to avulse, or remove, all or a portion of the toenail to facilitate drainage.

Dr. Azzara says that prior to performing the removal procedure she reviewed with Mrs. Ostrowski both the risks and complications of the procedure, including non-healing and loss of limb, as well as the risks involved with not treating the toe. Plaintiff executed a consent form authorizing Dr. Azzara to perform a total removal of her left big toenail. The nail was cut out. (Defendant testified that she cut out only a portion of the nail, although her records showed a total removal.)

Two days later, plaintiff saw her internist. He saw her four additional times in order to check the progress of the toe. As of June 30, 1983, the internist felt the toe was much improved. While plaintiff was seeing the internist, she continued to see Dr. Azzara, or her associate, Dr. Bergman. During this period the toe was healing slowly, as Dr. Azzara said one would expect with a diabetic patient.

During the time plaintiff was being treated by her internist and by Dr. Azzara, she continued to smoke despite advice to the contrary. Her internist testified at the trial that smoking accelerates and aggravates peripheral vascular disease and that a diabetic patient with vascular disease can by smoking accelerate the severity of the vascular disease by as much as fifty percent. By mid-July, plaintiff's toe had become more painful and discolored.

At this point, all accord ceases. Plaintiff claims that it was the podiatrist's failure to consult with the patient's internist and defendant's failure to establish by vascular tests that the blood flow was sufficient to heal the wound, and to take less radical care, that left her with a non-healing, pre-gangrenous wound, that is, with decaying tissue. As a result, plaintiff had to undergo immediate bypass surgery to prevent the loss of the extremity. If left untreated, the pre-gangrenous toe condition resulting from the defendant's nail removal procedure would have spread, causing loss of the leg. The plaintiff's first bypass surgery did not arrest the condition, and she underwent two additional bypass surgeries which, in the opinion of her treating vascular surgeon, directly and proximately resulted from the unnecessary toenail removal procedure on May 31, 1983. In the third operation a vein from her right leg was transplanted to her left leg to increase the flow of blood to the toe.

At trial, defense counsel was permitted to show that during the pre-treatment period before May 17, 1983, the plaintiff had smoked cigarettes and had failed to maintain her weight, diet, and blood sugar at acceptable levels. The trial court allowed this evidence of the plaintiff's pre-treatment health habits to go to the jury on the issue of proximate cause. Defense counsel elicited admissions from plaintiff's internist and vascular surgeon that some doctors believe there is a relationship between poor self-care habits and increased vascular disease, perhaps by as much as fifty percent. But no medical expert for either side testified that the plaintiff's post-treatment health habits could have caused her need for bypass surgery six weeks after defendant's toenail removal. Nevertheless, plaintiff argues that defense counsel was permitted to interrogate the plaintiff extensively on her post-avulsion and post-bypass health habits, and that the court allowed such evidence of plaintiff's health habits during the six weeks after the operation to be considered as acts of comparative negligence that could bar recovery rather than reduce her damages. The jury found that the

doctor had acted negligently in cutting out the plaintiff's toenail without adequate consideration of her condition, but found plaintiff's fault (fifty-one percent) to exceed that of the physician (forty-nine percent). She was therefore disallowed any recovery. On appeal the Appellate Division affirmed in an unreported decision. We granted certification to review plaintiff's claims. 108 *N.J.* 673 (1987). We are told that since the trial, the plaintiff's left leg has been amputated above the knee. This was foreseen, but not to a reasonable degree of medical probability at the time of trial.

## II

Several strands of doctrine are interwoven in the resolution of this matter. The concepts of avoidable consequences, the particularly susceptible victim, aggravation of preexisting condition, comparative negligence, and proximate cause each play a part. ·It may be useful to unravel those strands of doctrine for separate consideration before considering them in the composite.[1]

Comparative negligence is a legislative amelioration of the perceived harshness of the common-law doctrine of contributory negligence. *N.J.S.A.* 2A:15–5.1 to –5.8. In a fault-based system of tort reparation, the doctrine of contributory negligence served to bar any recovery to a plaintiff whose fault contributed to the accident. Whatever its conceptual underpinnings, its effect was to serve as a "gatekeeper." Epstein, "The Social Consequences of Common Law Rules," 95 *Harv.L.Rev.* 1717, 1736–37 (1982). Any fault kept a claimant from recovering under the system. Fault in that context meant a breach of a legal duty that was comparable to the duty of the other

---

· [1]This is by no means intended to be a comprehensive analysis of any or all of these doctrines since the ramifications of each are so complex. *E.g.,* the doctrine of comparative negligence has some limited application to the field of products liability, which is not fault-based at all. *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 164 (1979).

actors to exercise such care in the circumstances as was necessary to avoid the risk of injury incurred. Its prototype was the carriage driver who crossed the train tracks as the train was approaching the crossing. *British Columbia Elec. Ry. Co. v. Loach,* 1915 *A.C.* 719 (P.C.). Harsh, but clear.

Comparative negligence was intended to ameliorate the harshness of contributory negligence but should not blur its clarity. It was designed only to leave the door open to those plaintiffs whose fault was not greater than the defendant's, not to create an independent gate-keeping function. Comparative negligence, then, will qualify the doctrine of contributory negligence when that doctrine would otherwise be applicable as a limitation on recovery. In our discussion of comparative negligence we shall use the familiar example of one-on-one comparative negligence, although recent changes in the law modify the rule of recovery of damages, especially in multiple-party cases. *L.*1987, *c.* 325.

Related in effect, but not in theory, to the doctrine of contributory negligence is the doctrine of avoidable consequences. This doctrine has its roots in the law of damages. It has application in the law of contract, as well as in the law of torts. *N.J. Indus. Properties, Inc. v. Y.C. & V.L., Inc.,* 100 *N.J.* 432, 461 (1985) (Stein, J., dissenting) (quoting 5A *Corbin,* Contracts § 1039 at 241 (1964)). The doctrine proceeds on the theory that a plaintiff who has suffered an injury as the proximate result of a tort cannot recover for any portion of the harm that by the exercise of ordinary care he could have avoided. *See* W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on The Law of Torts* § 65 at 458–59 (5th Ed.1984) (hereinafter Prosser and Keeton); 62 *A.L.R.*3d 9 (1975) (discussing duty to minimize tort damages by surgery). It has a simple thesis of public policy:

[I]t is not true that the injured person has a duty to act, nor that the conduct of the tortfeasor ceases to be a legal cause of the ultimate harm; but recovery for the harm is denied because it is in part the result of the injured person's lack of care, and public policy requires that persons should be discouraged from

wasting their resources, both physical or economic. [*Restatement (Second)* of Torts § 918 at 500, comment a.]

Avoidable consequences, then, normally comes into action when the injured party's carelessness occurs *after* the defendant's legal wrong has been committed.[2] Contributory negligence, however, comes into action when the injured party's carelessness occurs *before* defendant's wrong has been committed or concurrently with it. Prosser and Keeton, *supra*, § 65 at 458–59; *see also Ayers v. Jackson Township*, 106 *N.J.* 557, 603 (1987) (" 'under the "avoidable consequences rule," [a claimant] is required to submit to treatment that is medically advisable; failure to do so may bar future recovery for a condition he could thereby have alleviated or avoided.' ") (quoting *Hagerty v. L & L Marine Servs., Inc.*, 788 *F.*2d 315, 319 (5th Cir.1986)).

A counterweight to the doctrine of avoidable consequences is the doctrine of the particularly susceptible victim. This doctrine is familiarly expressed in the maxim that "defendant 'must take plaintiff as he finds him.' " *Frame v. Kothari*, 212 *N.J.Super.* 498, 501 (Law Div.1985), *aff'd in part and rev'd in part*, 218 *N.J.Super.* 537 (App.Div.), *certif. granted*, 109 *N.J.* 45 (1987). The maxim has its roots in the almost intuitive sense of injustice that would excuse negligent conduct inflicted on the particularly susceptible victim. Like contributory negligence, this doctrine is harsh but clear in the opposite tendency. It is ameliorated by the doctrine of aggravation of a preexisting condition. While it is not entirely possible to separate the doctrines of avoidable consequence and preexisting condition, perhaps the simplest way to distinguish them is to understand that the injured person's conduct is irrelevant to the consideration of the doctrine of aggravation of a preexisting condition. Negligence law generally calls for an apportionment of damages when a plaintiff's antecedent negligence is "found not to

---

[2]In some cases carelessness that aggravates an injury (although not causing it) may precede the injury itself. *See, e.g., Waterson v. General Motors Corp.*, 111 *N.J.* 238 (1988) (failure to use seat belt, although not cause of injury, is cause of avoidable consequences).

contribute in any way to the original accident or injury, but to be a substantial contributing factor in increasing the harm which ensues." *Restatement (Second) of Torts,* § 465 at 510–11, comment c. Courts recognize that a defendant whose acts aggravate a plaintiff's preexisting condition is liable only for the amount of harm actually caused by the negligence. 2 F. Harper and F. James, *Law of Torts,* § 20.3 at 1128 (1956); Prosser and Keeton, *supra,* § 52 at 349. Because it is often difficult to determine how much of the plaintiff's injury is due to the preexisting condition and how much the aggravation is caused by the defendant, some courts have relieved plaintiffs of proving with great exactitude the amount of aggravation. In New Jersey, a physician has the burden of segregating recoverable damages from those solely incident to preexisting disease. *Fosgate v. Corona,* 66 *N.J.* 268, 272–73 (1974).

Finally, underpinning all of this is that most fundamental of risk allocators in the tort reparation system, the doctrine of proximate cause. It sounds simple, but

> [a]s every freshman student of tort law soon learns to his discomfort, "causation" is an inscrutably vague notion, susceptible to endless philosophical argument, as well as practical manipulation. This is evident most notoriously in the case of "proximate cause," that uniquely legal concept of causal responsibility whose protean puzzles have tangled the heads of generations of law students, scholars, and judges. [Robinson, "Multiple Causation in Tort Law: Reflections on the DES Cases," 68 *Va.L.Rev.* 713, 713 (1982).]

We have sometimes melded proximate cause with foreseeability of unreasonable risk. "When negligent conduct creates such a risk, setting off foreseeable consequences that lead to plaintiff's injury, the conduct is deemed the proximate cause of the injury." *Kelly v. Gwinnell,* 96 *N.J.* 538, 543 (1984). More traditionally:

> Proximate cause has been defined as "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." *Fernandez v. Baruch, et al.,* 96 *N.J.Super.* 125, 140 (App.Div.1967), rev'd on other grounds, 52 *N.J.* 127 (1968). Stated differently, plaintiff must prove that defendant's conduct constituted a cause in fact of his injuries and loss. An act or omission is not regarded as a cause of an event if the event would have occurred without it. *Kulas v. Public Service Elec. & Gas Co.,* 41 *N.J.* 311, 317

(1964); *Henderson v. Morristown Memorial Hospital*, 198 *N.J.Super.* 418, 428 (App.Div.1985); *see also Prosser, Torts*, § 41, at 238 (4th ed. 1971). If the injury or loss were to occur in the absence of a physician's negligence or malpractice, then before responsibility may be visited upon the defendant the negligent conduct or malpractice must have been shown to have been a substantial factor in causing the harm. [*Skripek v. Bergamo*, 200 *N.J.Super.* 620, 634 (App.Div.), *certif. denied*, 102 *N.J.* 303 (1985).]

We have been candid in New Jersey to see this doctrine, not so much as an expression of the mechanics of causation, but as an expression of line-drawing by courts and juries, an instrument of "overall fairness and sound public policy." *Brown v. United States Stove Co.*, 98 *N.J.* 155, 173 (1984). Juries, like courts, should understand the doctrine to be based on " 'logic, common sense, justice, policy and precedent.' " *Caputzal v. The Lindsay Co.*, 48 *N.J.* 69, 78 (1966) (quoting *Powers v. Standard Oil Co.*, 98 *N.J.L.* 730, 734 (Sup.Ct.), *aff'd o.b.*, 98 *N.J.L.* 893 (E. & A. 1923)). In this term of Court, we have been required to resolve varying aspects of the problem of proximate causation and the avoidance of damages in the context of the special duty of the health care provider to protect patients against their own self-destructive acts, *Cowan v. Doering*, 111 *N.J.* 451 (1988), or in the context of requiring the occupant of an automobile to wear a seat belt as a method of avoiding damages. *Waterson v. General Motors Corp.*, 111 *N.J.* 238 (1988).

### III

Each of these principles, then, has some application to this case.[3] Plaintiff obviously had a preexisting condition. It is

---

[3]Each principle, however, has limitations based on other policy considerations. For example, the doctrine of avoidable consequences, although of logical application to some instances of professional malpractice, is neutralized by countervailing policy. Thus, a physician who performed a faulty tubal ligation cannot suggest that the eventual consequences of an unwanted pregnancy could have been avoided by termination of the fetus. *Macomber v. Dillman*, 505 *A.2d* 810, 817 (Me.1986) (citing *University of Arizona Health Sciences Center v. Superior Court*, 136 *Ariz.* 579, 586 n. 5, 667 *P.2d* 1294, 1301 n.

alleged that she failed to minimize the damages that she might otherwise have sustained due to mistreatment. Such mistreatment may or may not have been the proximate cause of her ultimate condition.

But we must be careful in reassembling these strands of tort doctrine that none does double duty or obscures underlying threads. In particular, we must avoid the indiscriminate application of the doctrine of comparative negligence (with its fifty percent qualifier for recovery) when the doctrines of avoidable consequences or preexisting condition apply.

The doctrine of contributory negligence bars any recovery to the claimant whose negligent action or inaction *before* the defendant's wrongdoing has been completed has contributed to cause actual invasion of plaintiff's person or property. By contrast,

> "[t]he doctrine of avoidable consequences comes into play at a later stage. Where the defendant has already committed an actionable wrong, whether tort or breach of contract, then this doctrine [avoidable consequences] limits the plaintiff's recovery by disallowing only those items of damages which could reasonably have been averted * * * [.]" "[C]ontributory negligence is to be asserted as a complete defense, whereas the doctrine of avoidable consequences is not considered a defense at all, but merely a rule of damages by which certain particular items of loss may be excluded from consideration * * *." McCormick on Damages, West Publishing Company, 1935, Chapter 5, Avoidable Consequences, pages 127 *et seq.; see also* 61 *Harvard Law Review* (1947), 113, 131–134, Developments in Damages. Recognized universally, it is nonetheless understandable that variable conceptual explanations are given ranging from contributory negligence, as such, lack of proximate cause and a so-called "duty" to mitigate. [*Southport Transit Co. v. Avonale Marine Ways, Inc.*, 234 F.2d 947, 952 (5th Cir.1956) (footnotes omitted).]

■ Hence, it would be the bitterest irony if the rule of comparative negligence, designed to ameliorate the harshness

5 (1983); *Jones v. Malinowski,* 299 *Md.* 257, 259, 473 *A.2d* 429, 437–38 (1984); *Troppi v. Scarf,* 31 *Mich.App.* 240, 257–59, 187 *N.W.2d* 511, 519–20 (1971)). Thus, too, a physician who asserts the defense of aggravation of preexisting condition must bear a special burden of proof on that issue. *Fosgate v. Corona, supra,* 66 *N.J.* at 272–73. We offer these observations not for the correctness of their conclusion, but merely to show the mutations that every principle undergoes in its common-law evolution.

of contributory negligence, should serve to shut out any recovery to one who would otherwise have recovered under the law of contributory negligence. Put the other way, absent a comparative negligence act, it would have never been thought that "avoidable consequences" or "mitigation of damages" attributable to post-accident conduct of any claimant would have included a shutout of apportionable damages proximately caused by another's negligence. Negligent conduct is not "immunized by the concept of 'avoidable consequences.' This argument should more properly be addressed to the question of diminution of damages; it does not go to the existence of a cause of action." *Associated Metals & Minerals Corp. v. Dixon Chem. & Research, Inc.*, 82 *N.J.Super.* 281, 306 (App.Div.1963), *certif. denied*, 42 *N.J.* 501 (1964); *see also Flynn v. Stearns*, 52 *N.J.Super.* 115, 120–21 (App.Div.1958) ("Where the fault of the patient was subsequent to the fault of the physician and merely aggravated the injury inflicted by the physician, it *only affects* 'the amount of the damages recoverable by the patient.'" (emphasis added) (citation omitted)); *Restatement (Second) of Torts*, § 918 at 500 and comment a (doctrine of avoidable consequences "applies only to the diminution of damages and not to the existence of a cause of action").

The confusion between the existence of a cause of action and the diminution of damages has been the result of the melding of these principles in some jurisdictions under the Uniform Comparative Fault Act (U.C.F.A.), 12 U.L.A. 38 (1988 Supp.). That Act includes in its definition of fault an "unreasonable failure to avoid an injury *or to mitigate damages.*" U.C.F.A. § 1(b) (emphasis added). It has been held that:

> "This should be read together with another sentence providing that plaintiff's contributory fault proportionately diminishes the amount awarded as damages 'for an injury attributable to the claimant's[4] contributory fault' (§ 1(a)). The Act therefore covers the concept of avoidable consequences and provides that

---

[4]Significantly, the U.C.F.A. states that such fault "diminishes proportionately the amount awarded as compensatory damages * * * *but does not bar recovery.*" U.C.F.A. § 1(a) (emphasis added). It has no "gatekeeper" function.

for a particular injury that could have been avoided by the plaintiff or for the diminution of damages that he could have effected by the exercise of reasonable care, the amount will be diminished proportionately according to the comparative fault of the parties." Wade, Products Liability and Plaintiff's Fault—The Uniform Comparative Fault Act, 29 *Mercer L.Rev.* 373, 385–86 (1978). Mitigation of damages is expressly included in the UCFA. Expressing mitigation of damages as a percentage of fault reducing plaintiff's damages is the proper method for fairly accounting for the failure to mitigate as was done in the instructions.[5] [*Love v. Park Lane Medical Center,* 737 *S.W.*2d 720, 724–25 (Mo.1987) (en banc).]

In this context of post-injury conduct by a claimant, given the understandable complexity of concurrent causation, expressing mitigation of damages as a percentage of fault which reduces plaintiff's damages may aid juries in their just apportionment of damages, provided that the jury understands that neither mitigation of damages nor avoidable consequences will bar the plaintiff from recovery if the defendant's conduct was a substantial factor without which the ultimate condition would not have arisen.

██ Whether denoted in terms of foreseeability or in terms of proximate cause, "[t]he assessment as to whether conduct can be considered sufficiently causally connected to accidental harm so as to justify the imposition of liability also implicates concerns for overall fairness and sound public policy." *Brown v. United States Stove Co., supra,* 98 *N.J.* at 173. In the field

[5]Strictly speaking, comparative "fault" is not really a fair measure of comparative contribution to damages. Comparative negligence is generally "viewed as a liability doctrine, rather than a damage doctrine." Note, *A Compromise Between Mitigation and Comparative Fault?: A Critical Assessment of the Seat Belt Controversy and a Proposal for Reform,* 14 *Hofstra L.Rev.* 319, 327 (1986). In the "classic 'one-on-one' situation," principles of justice preclude recovery when "plaintiff's conduct is *similar in scope and in nature* to that of the defendant." *Id.* at 328. That symmetry is lacking in this context. A low level of fault by a heart surgeon may produce a catastrophic result; a high degree of fault by a patient may have but little effect on the ultimate outcome. Still, in this uncertain science it may be as good a measure as any to give guidance to a jury in evaluating multiple culpable causes of harm. "[I]t is not clear that an apportionment based on fault, as required by most Canadian and American statutes, will lead to different results from one based on causation * * *." H.L.A. Hart & T. Honore, *Causation In the Law* 234 (2d ed. 1985).

of professional health care, given the difficulty of apportionment, sound public policy requires that the professional bear the burden of demonstrating the proper segregation of damages in the aggravation context. *Fosgate v. Corona, supra,* 66 *N.J.* at 272–73. The same policy should apply to mitigation of damages. *But see Tisdale v. Fields,* 183 *N.J.Super.* 8 (App. Div.1982) (for discussion of policy in non-medical malpractice context). Hence, overall fairness requires that juries evaluating apportionment of damages attributable in substantial part to a faulty medical procedure be given understandable guidance about the use of evidence of post-treatment patient fault that will assist them in making a just apportionment of damages and the burden of persuasion on the issues. This is consistent with our general view that a defendant bear the burden of proving the causal link between a plaintiff's unreasonable conduct and the extent of damages. *Dziedzic v. St. John's Cleaners & Shirt Launderers, Inc.,* 53 *N.J.* 157 (1969). Once that is established, it should be the "defendant who also has the burden of carving out that portion of the damages which is to be attributed to the plaintiff." *Id.* at 165.

## IV

As noted, in this case the parties agree on certain fundamentals. The pre-treatment health habits of a patient are not to be considered as evidence of fault that would have otherwise been pled in bar to a claim of injury due to the professional misconduct of a health professional. This conclusion bespeaks the doctrine of the particularly susceptible victim or recognition that whatever the wisdom or folly of our life-styles, society, through its laws, has not yet imposed a normative life-style on its members; and, finally, it may reflect in part an aspect of that policy judgment that health care professionals have a special responsibility with respect to diseased patients. *See Procanik by Procanik v. Cillo,* 97 *N.J.* 339, 348 (1984) (although preexisting infection was underlying cause of the condi-

tion transmitted to infant, physician had duty to take all reasonable medical procedures to avert the harm).

This does not mean, however, that the patient's poor health is irrelevant to the analysis of a claim for reparation. While the doctor may well take the patient as she found her, she cannot reverse the frames to make it appear that she was presented with a robust vascular condition; likewise, the physician cannot be expected to provide a guarantee against a cardiovascular incident. All that the law expects is that she not mistreat such a patient so as to become a proximate contributing cause to the ultimate vascular injury.

■ However, once the patient comes under the physician's care, the law can justly expect the patient to cooperate with the health care provider in their mutual interests. Thus, it is not unfair to expect a patient to help avoid the consequences of the condition for which the physician is treating her. While the conduct on the part of the patient is not "similar in scope and in nature to that of the defendant," *supra* at 443 n. 5, we can at the same time recognize that the principles of comparative negligence may be of assistance to a jury in determining the just allocation of responsibility for damages. As noted, expressing mitigation of damages as a percentage of fault reducing a plaintiff's damages has been found to be a proper method for fairly accounting for failure to mitigate. *Love v. Park Lane Medical Center, supra,* 737 *S.W.*2d at 724–25. In New Jersey, the Comparative Negligence Act is much less detailed than the Uniform Act. The critical section, *N.J.S.A.* 2A:15–5.1, consists of but two sentences. The first sentence bars recovery if the claimant's contributory negligence exceeds that of the person against whom recovery is sought or the combined negligence of those against whom recovery is sought. The second sentence states that "[a]ny damages sustained shall be diminished by the percentage sustained of negligence attributable to

the person recovering." *N.J.S.A.* 2A:15–5.1.[6] Our Act is not specific in relating avoidable consequences to comparative percentages of recovery. But we may sensibly harmonize the doctrines by using a measure of the fault that enhanced the damages to apportion them. *See Brazil v. United States*, 484 *F.Supp.* 986, 992 (N.D.Ala.1979) (plaintiff's fault contributed to cause fifty-five percent of his total damages. He recovers only forty-five percent).

■ Hence, we approve in this context of post-treatment conduct submission to the jury of the question whether the just mitigation or apportionment of damages may be expressed in terms of the patient's fault.[7] If used, the numerical allocation of fault should be explained to the jury as a method of achieving the just apportionment of the damages based on their relative evaluation of each actor's contribution to the end result—that the allocation is but an aspect of the doctrine of avoidable consequences or of mitigation of damages. In this context, plaintiff should not recover more than she could have reasonably avoided, but the patient's fault will not be a bar to recovery except to the extent that her fault caused the damages.

An important caveat to that statement would be the qualification that implicitly flows from the fact that health care professionals bear the burden of proving that their mistreatment did not aggravate a preexisting condition: that the health care

---

[6]*N.J.S.A.* 2A:15–5.2 sets forth the required format for findings of fact under the Act, and the role of the court in molding the judgment. As noted, this was amended by *L.* 1987, *c.* 325, to qualify recovery and modify rights of joint and several liability.

[7]In a limited number of situations, the plaintiff's unreasonable conduct may be found to have caused only a separable part of the damages. *See Waterson v. General Motors Corp., supra,* 111 *N.J.* 238 (jury required to determine what damages are solely due to "second injury"). If this latter method of submitting the issue to the jury is a more pragmatic way of submitting the issue in a case, court and counsel may wish not to compound the difficulty of superimposing on such apportionment the necessity of resolving percentages of fault.

professional bear the burden of proving the damages that were avoidable.

Finally, before submitting the issue to the jury, a court should carefully scrutinize the evidence to see if there is a sound basis in the proofs for the assertion that the post-treatment conduct of the patient was indeed a significant cause of the increased damages. Given the short onset between the contraindicated surgery and the vascular incident here, plaintiff asserts that defendant did not present proof, to a reasonable degree of medical probability, that the plaintiff's post-treatment conduct was a proximate cause of the resultant condition. Plaintiff asserts that the only evidence given to support the defense's theory of proximate cause between plaintiff's post-treatment health habits and her damages was her internist's testimony regarding generalized studies showing that smoking increases vascular disease by fifty percent, and her vascular surgeon's testimony that some physicians believe there is a relationship among diabetes, smoking, and vascular impairment. Such testimony did not address with any degree of medical probability a relationship between her smoking or not between May 17, 1983, and the plaintiff's need for bypass surgery in July 1983. Defendant points to plaintiff's failure to consult with her internist as a cause of her injury, but the instruction to the jury gave no guidance on whether this was to be considered as conduct that concurrently or subsequently caused her injuries. *See Brazil v. United States, supra,* 484 *F.Supp.* at 990 (disobedience of instructions to remain still aggravated misdiagnosed spinal condition).

V

We acknowledge that it is difficult to parse through these principles and policies in the course of an extended appeal. We can well imagine that in the ebb and flow of trial the lines are not easily drawn. There are regrettably no easy answers to these questions.

The factual circumstances of this case present several complexities:

1.  the jury had to consider plaintiff's pre-treatment health condition to resolve whether the physician's toenail removal procedure was in any way a proximate cause of the bypass surgery to her leg or whether it was the decreased vascular flow attributable to her diabetic condition that required bypass surgery to her leg;

2.  the jury had to determine under the doctrine of contributory/comparative negligence whether plaintiff's post-treatment conduct (the pre-avulsion failure to consult with her internist) was a cause of her *injury,* the contraindicated toe surgery and its possibly consequent damage, the bypass surgery;

3.  the jury had to consider under the doctrine of avoidable consequences plaintiff's post-treatment conduct (post-operative failure to observe diet and smoking rules) was a cause of her *damages,* the bypass surgery, and the potential loss of the limb.

We find that the instructions to the jury in this case did not adequately separate or define the concepts that were relevant to the disposition of the plaintiff's case.

First, we note that the jury interrogatories did not specifically cordon off the jury's consideration of health habits to either the pre-treatment period or the post-treatment period. The interrogatories asked only whether plaintiff's failure "to exercise that [reasonable] degree of care for her own safety and well-being" was "a proximate cause of her injuries *and* damages." (emphasis added).

We recognize that the general charge restricted the jury to considering defendant's contention "that the plaintiff failed to exercise from and after the time of commencing treatment with defendant, in [the] circumstances presented here, that degree of care for her own safety and well being which a person or ordinary prudence would exercise under similar circumstances."

The court went on to instruct the jury that if it found both parties negligent, it should "compute" or "translate their respective degrees of fault, if any, into a percentage of [the] total amount of negligence causing the injuries and damages complained of."

■ Second, the instruction did not distinguish between the patient's pre-operative and post-operative conduct. In melding the causation of "injuries and damages," the charge did not separate the post-treatment conduct that could serve to avoid any recovery (was her failure to consult with her internist a prior or concurrent cause of the contraindicated toenail removal) and her post-treatment conduct that would serve only to mitigate her damages (was the extent of her vascular damage an avoidable consequence of her continued failure to follow dietary and smoking rules).

Defense counsel had emphasized from his opening that plaintiff was a "19–year non-compliant diabetic who admitted neglecting her diet and maintaining her appropriate sugar and acetone test as instructed by her doctors." And he wound up his summation by reminding the jury that the plaintiff

didn't pay any attention to her diet, her testing, her smoking for years prior to the time that she ever saw Dr. Azzara.

\*    \*    \*    \*    \*    \*    \*    \*

She persistently failed to honor her dietary restrictions to control her weight, to test the blood sugar, to eliminate the smoking even after having experienced first hand significant consequences of that failure to act.

Now, admittedly exercising such control is not always easy. The simple fact is, ladies and gentlemen, unless one endeavors to do so, one cannot, one should not be permitted in fairness, to blame another to the consequences of one's own inaction. I ask you to return a verdict in Lynn Azzara's favor.

Given the limited role that pre-treatment health habits have in such a case, *i.e.*, being limited to causation, not fault, there is potential for jury misunderstanding of the repeated reference to plaintiff's failings in her health habits.

■ Finally, the court's instruction permitted the jury to bar the plaintiff entirely from recovery of damages that were justly attributable to the physician. It did not explain that the portion

of fault attributable to plaintiff's failure to mitigate damages would not serve to bar recovery entirely. On the motion for new trial, the trial court set forth its understanding of its own charge: "It was not error to submit comparative negligence as a complete defense based on the actions with regard to mitigation of damages."

It is this point that we now clarify with respect to the relationship between the doctrine of comparative negligence and mitigation of damages. The doctrine of comparative negligence, although a useful method for apportioning damages in the mitigation/avoidance context, does not transform those doctrines into "gatekeeper" doctrines that preclude any recovery. Of course, just as at common law, there can be cases of mitigation or avoidance expressed through comparative fault where the plaintiff will have no recovery or almost no recovery.

We appreciate that these concepts have not received a full exposition in our decisions heretofore and that court and counsel in this case had to adapt the concepts to a most complex factual situation. Nonetheless, we believe that the instructions given had the capacity to bring about an unjust result, *i.e.,* one that would not have been reached at common law since neither the doctrine of mitigation of damages or of avoidable consequences would have caused an injured plaintiff to lose any recovery were the patient responsible only for a portion of the resulting damages. In addition, as we have noted, the charge had the capacity to permit the jury to consider the patient's pre-treatment health habits as fault that could bar her recovery.

We note that the plaintiff argues that there was not competent professional medical evidence from which a jury could infer that a change in post-operative health habits of the plaintiff would have in any way avoided the consequences of the imprudent toenail surgery, and that there was no competent proof that plaintiff's failure to consult with her internist or misrepresentation of that consultation was a proximate cause of the improper toenail surgery. On the first point, since there

was evidence in the case of potential loss of further use of the limb, the trial court was of the view that the plaintiff's failure to follow the physician's advice was at least relevant to "mitigate against that risk occurring." There should be a careful scrutiny of the proofs on remand before resubmitting these questions to a jury. In this regard, the jury should be instructed how to use the information contained in relevant admissible medical records.

Plaintiff argues that any retrial be limited to damages, with the jury's finding of malpractice and proximate cause binding on the retrial. We believe that the interwoven facts of this case do not permit such a partial retrial.

The judgment of the Appellate Division is reversed and the case is remanded to the Law Division for a new trial.

*For reversal and remand*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.