SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

### Judy Komlodi v. Anne Picciano, M.D. (A-13-12) (071301)

**Argued October 7, 2013 -- Decided May 20, 2014**

**ALBIN, J., writing for a unanimous Court.**

This appeal concerns the propriety of a jury charge on causation in a medical malpractice action.

Defendant Dr. Anne Picciano prescribed a Duragesic patch to treat Michelle Komlodi, a patient suffering from chronic back pain who was known to abuse drugs and alcohol.  The Duragesic patch is intended to be applied to the outer skin and to release the powerful pain medication fentanyl over a seventy-two hour period.  Michelle orally ingested the Duragesic patch, causing a severe and permanent brain injury.  Michelle's mother, as guardian for her incapacitated daughter, filed a medical malpractice action against Dr. Picciano and her employer.  The primary focus of the trial was whether Dr. Picciano breached the governing duty of care in prescribing a Duragesic patch to Michelle, a known abuser of drugs and alcohol, and whether Dr. Picciano, Michelle, or both were substantial factors in causing Michelle's injury.  The trial court charged the jury on avoidable consequences and superseding/intervening causation, but not on comparative negligence.  The court also provided a preexisting condition charge, also known as a Scafidi[1] charge, instructing the jury to consider whether, based on the patient's preexisting condition, prescribing the Duragesic patch increased the risk of harm to the patient and whether it was a substantial factor in causing the ultimate injury.

The jury found that plaintiff proved that Dr. Picciano deviated from the applicable standard of care and that the deviation increased the risk of harm posed by Michelle's preexisting condition.  Because the jury also found that plaintiff did not prove that the increased risk was a substantial factor in producing Michelle's medical condition, however, based on the Scafidi charge, Dr. Picciano did not bear legal fault in causing Michelle's brain injury. A no-cause verdict was therefore entered in defendants' favor.  In a split decision, the Appellate Division overturned the verdict and remanded for a new trial. The majority found that the trial court erred by providing the jury a Scafidi charge and a superseding/intervening cause charge, and by including the concept of "but for" causation in its proximate cause instruction.  Judge Ashrafi, dissenting, disagreed that the Scafidi charge was improper, stating that Michelle's drug addiction was irrefutably a preexisting condition that was a proximate cause of her ingestion of the patch causing her brain injury.  He also considered the trial court's reference to "but for" causation harmless error.  In his opinion, "[t]he jury's verdict was based on the evidence and on correct instructions as a whole," and accordingly there was no justification to reverse the no-cause verdict.  Defendants appealed as of right under Rule 2:2-1(a).

**HELD**:  The trial court erred in providing a preexisting condition jury charge under the circumstances of this case and, even if the Scafidi charge were appropriate, it suffered from multiple defects. The trial court was correct to charge the jury on avoidable consequences and superseding/intervening causation, and not comparative negligence, but improperly referenced "but for" causation in its instruction on proximate cause.  Throughout the causation charge, the trial court failed to tailor the complex concepts of causation to the theories and facts advanced by the parties.

1. To ensure that the jury understands its task of deciding issues of liability and apportionment of damages, the court must provide accurate, clear, and understandable instructions on the law tailored to the theories and facts of the case.  In a medical-malpractice action, the plaintiff has the burden of proving the relevant standard of care governing the defendant-doctor, a deviation from that standard, an injury proximately caused by the deviation, and damages suffered from the defendant-doctor's negligence.  In this case, the jury found that Dr. Picciano deviated from the applicable standard of care.  At issue is the propriety of the trial court's jury charge on causation. (pp. 26-29)

2. A tortfeasor is generally only liable for the harm she actually caused to the plaintiff.  In cases where the plaintiff is responsible for the harm she suffers, in whole or in part, the doctrines of comparative negligence, avoidable consequences, and superseding/intervening

---

[1] Scafidi v. Seiler, 119 N.J. 93 (1990).

causation may serve to absolve or limit the defendant's liability. The comparative-negligence statute permits recovery, and apportionment of damages, so long as the plaintiff's "negligence was not greater than the negligence of the person against whom recovery is sought." N.J.S.A. 2A:15-5.1. Thus, if the plaintiff's negligence is fifty-one percent and defendant's is forty-nine percent, the plaintiff receives no recovery. Comparative negligence "comes into action when the injured party's carelessness occurs before defendant's wrong has been committed or concurrently with it." Ostrowski v. Azzara, 111 N.J. 429, 438 (1988). In contrast, the doctrine of avoidable consequences applies when a plaintiff's carelessness that occurs after the defendant's tortious act causes plaintiff additional harm. Id. at 438, 441. Unlike comparative negligence, avoidable consequences is not a defense to liability and serves only to mitigate damages. In Ostrowski, the Court held that trial courts "must avoid the indiscriminate application of the doctrine of comparative negligence (with its fifty percent qualifier for recovery) when the doctrines of avoidable consequences or preexisting condition apply." Id. at 441. In the present case, an avoidable consequences jury charge without a comparative negligence charge was appropriate because plaintiff ingested the Duragesic patch after Dr. Picciano allegedly violated the standard of care by prescribing the patch. (pp. 29-33)

3. When a patient is treated for a preexisting condition and a physician's negligence worsens that condition, it may be difficult to identify and prove the precise injury caused by the physician. To address this scenario, in Scafidi the Court held that a jury must decide whether any "negligent treatment increased the risk of harm posed by a preexistent condition" and, if so, "whether the increased risk was a substantial factor in producing the ultimate result." 119 N.J. at 108. In the typical Scafidi case, the plaintiff seeks treatment for a preexisting condition and the physician negligently fails to diagnose or treat the condition, causing the preexisting condition to progress and worsen. The amount of damages caused by the aggravation of the preexisting condition due to the physician's negligence is "the value of the lost chance of recovery." Id. at 112. Unlike the doctrines of comparative negligence, avoidable consequences, and superseding/intervening causation, Scafidi-type cases generally do not implicate fault on the part of the plaintiff. Here, it is Michelle's failure to properly use the Duragesic patch after Dr. Picciano's alleged negligence that is at issue. Because the Scafidi charge was used to allocate fault, not just damages, it served as a substitute for the comparative-fault charge -- without the fifty-one percent fault bar. The Scafidi charge also had the capacity to confuse the jury because it became blurred with the charge on avoidable consequences and superseding/intervening cause. In addition, even if the Scafidi charge were appropriate, the trial court improperly failed to tailor the legal theories and facts of this case to the law on preexisting conditions or to identify the specific preexisting condition or disease at issue. The misapplication of the Scafidi charge requires a remand for a new trial. (pp. 33-38)

4. Although the panel majority was correct in asserting that "if Michelle's deliberate act was foreseeable, then it was not a superseding cause," that is not a sufficient reason for not instructing the jury on superseding/intervening cause. Foreseeability is a constituent part of proximate cause. If an injury is not a foreseeable consequence of a person's act, then a negligence suit cannot prevail. A superseding or intervening act is one that breaks the "chain of causation" linking a defendant's wrongful act and an injury suffered by a plaintiff. Cowan v. Doering, 111 N.J. 451, 465 (1988). Intervening causes that are "foreseeable" or the "normal incidents of the risk created," however, will not break the chain of causation and relieve a defendant of liability. Model Jury Charge (Civil) § 6.14 (Aug. 1999). Thus, the concepts of foreseeability and superseding/intervening causation are inextricably interrelated and the jury needs to have a full understanding of both. Although the trial court here was correct to charge the jury on both concepts, it failed to help the jury sort through the complex issues by molding its charge to the facts of the case. The jury had to determine whether, given Michelle Komlodi's medical history of addiction, her oral ingestion of the Duragesic patch was "reasonably foreseeable or was . . . a remote or abnormal incident of the risk of self-injury that was not otherwise reasonably foreseeable by defendants." Cowan, 111 N.J. at 465. Intertwined with that question was whether Michelle's act was "volitional and not attributable to [her] disorder or condition." Ibid. (pp. 38-43)

5. The trial court also failed to tailor the avoidable-consequences charge to the legal theories and facts presented. The avoidable-consequences charge will only be meaningful to a jury hearing this case if it addresses the special circumstances presented here -- plaintiff's capacity to act reasonably to care for herself in light of her drug and alcohol addiction. To that end, the Court provides a recommended charge. Finally, the trial court improperly referenced "but for" causation during its instruction on proximate cause. A "but for" charge is appropriate when there is only one potential cause of the harm or injury. In contrast, the "substantial factor" test is given when there are concurrent causes potentially capable of producing the harm or injury. The substantial-factor test should be used to decide proximate cause at the new trial. (pp. 44-48)

The judgment of the Appellate Division is **AFFIRMED** and **MODIFIED**, the no-cause verdict is **VACATED**, and the matter is **REMANDED** to the trial court for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA and PATTERSON and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE ALBIN's opinion.**

2

JUDY KOMLODI, as Guardian for
MICHELLE KOMLODI, an
incapacitated person,

    Plaintiff-Respondent,

        v.

ANNE PICCIANO, M.D. and JFK
MEDICAL CENTER,

    Defendants-Appellants.


        Argued October 7, 2013 – Decided May 20, 2014

        On appeal from the Superior Court, Appellate
        Division.

        Gary L. Riveles argued the cause for
        appellants (Dughi, Hewit & Domalewski,
        attorneys).

        John B. Collins argued the cause for
        respondent (Bongiovanni, Collins & Warden,
        attorneys).

        E. Drew Britcher argued the cause for amicus
        curiae New Jersey Association for Justice
        (Britcher, Leone, & Roth, attorneys; Mr.
        Britcher and Kristen B. Miller, on the
        brief).


    JUSTICE ALBIN delivered the opinion of the Court.

    In medical malpractice cases, juries are often called on to

sift through mounds of testimonial evidence, including expert

testimony, and to absorb complex legal theories on duty of care

and causation. Juries cannot fulfill the difficult task of rendering a fair and just verdict without accurate, clear, and understandable instructions on the law. That guidance must be provided by our trial courts. Our courts must explain how the legal principles apply to the facts and the parties' competing arguments in a charge that is accessible and comprehensible to citizens not trained in the law. This is not an easy undertaking, but it is a necessary one.

In the present case, a family-care physician prescribed a powerful medication, a Duragesic patch, to treat a patient who suffered from chronic back pain -- a patient who also was known to abuse alcohol and drugs. The seventy-five-microgram Duragesic patch is intended to be applied to the outer skin and to release the drug fentanyl over a seventy-two hour period. The patch has the potency of eighty Percocet tablets. The patient orally ingested the Duragesic patch, causing a severe and permanent brain injury.

The complaint in this medical malpractice action alleges that the physician breached the governing duty of care by failing to protect a patient with a history of alcohol and drug abuse from self-injury. The central issue in this appeal from the jury's no-cause verdict concerns various portions of the trial court's charge on causation.

The trial court charged the jury on "preexisting disease or

2

condition," also known as a <u>Scafidi</u>[2] charge. The <u>Scafidi</u> charge
is typically used in medical malpractice cases in which
progressive diseases, such as cancer, are not properly treated
or timely detected and thus the measure of damages is the
patient's lost chance of recovery. The jury here was instructed
to consider whether, based on the patient's preexisting
condition, prescribing the Duragesic patch increased the risk of
harm to the patient and whether it was a substantial factor in
causing the ultimate injury. The trial court, however, never
identified in its jury charge the preexisting condition or
related the facts to the law as required by the Model Jury
Charge. This case, moreover, did not involve the ineluctable
progression of a disease on its own. The ultimate harm caused
to the patient was from her own conduct -- whether volitional or
not -- <u>after</u> the physician prescribed the Duragesic. For that
reason, the court also charged the jury on
superseding/intervening causation and avoidable consequences.

The Appellate Division, in a split decision, overturned the
verdict and remanded for a new trial, finding that the trial
court erred in giving the <u>Scafidi</u> charge and, in any event,
failed to articulate for the jury the nature of the preexisting
condition or explain the proofs and parties' arguments in
relation to the law. The panel majority also determined that

---

[2] <u>Scafidi v. Seiler</u>, 119 <u>N.J.</u> 93 (1990).

the court should not have given a superseding/intervening cause charge because the general charge on foreseeability was sufficient. Additionally, it pointed out that the court had mistakenly included the concept of "but for" causation in a case involving concurrent causes.

We agree with the panel majority that the trial court misapplied the Scafidi charge. This was not the traditional lost-chance-of-recovery case. The Scafidi charge, moreover, was given for a purpose not intended by our preexisting-condition jurisprudence. Indeed, the defense -- as was made clear in summation -- was based on superseding/intervening causation and avoidable consequences, not preexisting condition. We also agree with the panel majority that, throughout the charge, the trial court failed to explain the complex concepts of causation in relation to the proofs and legal theories advanced by the parties.

We part ways with the panel majority's conclusion that the charge on superseding/intervening causation was unnecessary in light of the general charge on foreseeability. To the contrary, the superseding/intervening causation charge, if properly given, had the capacity to focus the jury's attention on the differences between the parties' contentions. Last, the "but for" causation reference apparently was an inadvertent mistake to which no objection was made by either party.

4

We therefore affirm and modify the judgment of the Appellate Division and remand for a new trial.

I.

A.

Plaintiff Judy Komlodi, as guardian for her incapacitated daughter, Michelle, filed a medical malpractice action against defendants Dr. Anne Picciano and JFK Medical Center. The malpractice action arises from the treatment of Michelle by Dr. Picciano at the hospital's outpatient and behavioral health clinic. Dr. Picciano was presented with a thirty-one-year-old woman who complained of back pain and suffered from depression, anxiety, and drug and alcohol addiction. Plaintiff alleges that Dr. Picciano negligently prescribed a Duragesic patch to treat Michelle's back pain, disregarding the real prospect that her drug-addicted daughter would abuse the medication. Indeed, Michelle orally ingested the contents of the patch, which led to respiratory arrest and anoxic brain damage, causing severe and permanent disabilities.

The case was tried to a jury. Here is a summary of the testimony heard by the jury.

B.

The primary focus of the trial was whether Dr. Picciano acted with reasonable care in prescribing a Duragesic patch to

Michelle and whether Dr. Picciano, Michelle, or both were substantial factors in causing the tragic outcome. Before reciting a narrative of events, we begin with a brief description of the Duragesic patch, as described by Dr. Picciano with reference to the Physician's Desk Reference (58th ed. 2004).

The Duragesic patch contains the powerful pain medication fentanyl, an opioid analgesic, in a gel form. The patch is attached to the skin and is designed to release seventy-five-micrograms of fentanyl per hour over a seventy-two-hour period. The Duragesic patch is not intended for "the management of mild or intermittent pain that can otherwise be managed by lesser means," but rather for the treatment of chronic pain that does not respond to Percocet, a medication for the relief of moderate to moderately severe pain. The seventy-five-microgram Duragesic patch is the equivalent of eighty Percocets. One side effect of the Duragesic patch is suppression of the respiratory system.

## C.

Dr. Picciano was an employee of JFK Medical Center specializing in family medicine and held the position of Associate Director of the Family Practice Center. Michelle had been Dr. Picciano's patient as a teenager, at a time when Michelle was being treated by other doctors for drug addiction and depression. On June 7, 2004, Mrs. Komlodi, a former

6

nonmedical employee of the Family Practice Center, brought Michelle, then age thirty-one, to Dr. Picciano for an examination.

June 7, 2004

That day, Dr. Picciano learned from Michelle that she had been suffering from lower back pain for six months and had experienced insomnia, depression, fatigue, anxiety, shortness of breath, and weight gain. Michelle also told of having "passive suicidal ideation" and of cutting her wrists two weeks earlier.[3]

Michelle related that her back pain began after she stopped using heroin and that she did not find relief by taking Aleve, Advil, or Tylenol. Michelle admitted that she was self-medicating with alcohol and drugs, such as Percocet and Duragesic patches, which were given to her by a friend.

At trial, Dr. Picciano acknowledged that bodily pains, anxiety, depression, and medication craving are all symptoms of drug withdrawal. She also acknowledged that an addict's craving can overcome her will. Dr. Picciano understood the medical uses and the potential abuse of the Duragesic patch. Too high a dose, Dr. Picciano explained, can stop a patient from breathing. Moreover, Dr. Picciano understood that the use of the patch with other depressants, such as alcohol, could fatally compromise the

---

[3] Some of this information was related to a nurse and written on Michelle's medical chart, which was reviewed by Dr. Picciano.

7

central nervous system.  She realized that because the Duragesic patch might be a medication sought by addicts, it should be prescribed with caution to those with a history of alcohol or drug abuse.  At the time that she treated Michelle, Dr. Picciano also was aware that the Duragesic patch could be cut open and the fentanyl directly accessed by an addict.  However, the Duragesic manufacturer did not explicitly warn of this potential for its abuse until 2005.

Dr. Picciano ordered an x-ray, seeking to determine the source of Michelle's back pain, and blood work.  Given Michelle's revelations, she also advised Michelle to contact Rutgers Behavioral Health.  No medications were prescribed.  Three days later, Michelle's blood-test results suggested that she might have hepatitis C, a disease that poses a serious danger to the liver.

June 18, 2004

On June 18, Mrs. Komlodi informed Dr. Picciano that Michelle did not have insurance coverage for Rutgers Behavioral Health and that Michelle was scheduled for an appointment at JFK Behavioral Health Center on July 21 -- more than a month later.  Mrs. Komlodi expressed concern that, in the intervening month, Michelle needed medication to treat her depression.  Dr. Picciano knew that a patient who suffers from depression and presents a "complicated history with addiction" needs

8

"comprehensive care from a mental health facility."
Nevertheless, she "reluctantly" agreed to prescribe the anti-
depressant Zoloft as a bridge until Michelle's mental health
appointment. Dr. Picciano arranged for Mrs. Komlodi to hold the
pills and give her daughter only one-half a pill every day for
the first week.

July 22, 2004

At Michelle's appointment on July 22, Michelle told Dr.
Picciano that she had missed her appointment at JFK Behavioral
Health Center the day before and had rescheduled it for August
4. She also told Dr. Picciano that she was still experiencing
lower back pain, with the pain registering a "9" on a scale of
one to ten, and that she was taking "Zoloft that she had gotten
as samples." Michelle had yet to fill the legitimate
prescription of Zoloft given to her by Dr. Picciano. Michelle
stated that, at various times, she was taking Percocet,
"routinely" using seventy-five-microgram Duragesic patches, or
consuming "at least" ten alcoholic drinks a day.

Dr. Picciano explained at trial that, in light of
Michelle's hepatitis C diagnosis and the inflammation of her
liver, the continued use of alcohol presented the greatest
immediate threat to her life because of its potential to damage
her liver. Dr. Picciano could not identify whether the source
of Michelle's back pain was a prior automobile accident or

9

depression and anxiety. Her objective was to stop Michelle from treating her pain with alcohol. Percocet was ruled out as an appropriate medication because Michelle might take more than the prescribed dose or combine it with alcohol. Dr. Picciano was aware that Michelle was procuring illicit drugs, including Duragesic patches and Percocet, and abusing alcohol.

Because Michelle's mental health appointment was two weeks away, Dr. Picciano decided to provide a steady level of immediate relief for her back pain by prescribing ten seventy-five-microgram Duragesic patches -- a quantity that would last for thirty days. Dr. Picciano warned Michelle that she could not drink alcohol while using the Duragesic patch. Michelle assured Dr. Picciano that she would not. It was Dr. Picciano's assessment that Michelle would not use illicit drugs or alcohol if she were on a Duragesic regimen of pain relief. Indeed, Dr. Picciano would never have prescribed the Duragesic patch for Michelle if she believed Michelle would continue to use alcohol. Dr. Picciano rejected the possibility that Michelle was engaged in drug-seeking behavior.

July 29, 2004

One week after that appointment, Dr. Picciano received a telephone call from Mrs. Komlodi who stated that Michelle had been binge drinking and was complaining of severe stomach pains. Dr. Picciano told Mrs. Komlodi to take her daughter immediately

10

to the emergency room at JFK Medical Center. There, a blood test revealed that Michelle was pathologically intoxicated. She registered a 0.36 percent blood alcohol concentration, an amount four-and-one-half times the legally permissible limit for driving.[4] In addition, her urine tested positive for cocaine. Michelle advised the emergency room intake unit that she had been prescribed fentanyl for "outpatient detox," but had yet to fill the prescription.

Dr. Picciano called her partner, Dr. Sherrod Patel, who was the attending physician for her practice group at JFK Medical Center at that time. Dr. Picciano described Michelle's case to Dr. Patel and told him to expect her arrival in the emergency room. She also told Dr. Patel that Michelle required psychiatric intervention and that he should try to transfer her to an inpatient unit. Michelle was admitted to the hospital overnight and released the next day. Dr. Picciano did not cancel the Duragesic prescription.

Despite the emergency-room chart indicating that Michelle had yet to fill the Duragesic prescription, Dr. Picciano not only assumed that she had filled it, but also that she had begun using the patches. Dr. Picciano nevertheless made no attempt to prevent Michelle from continuing to use the prescribed

---

[4] N.J.S.A. 39:4-50(a) (defining "[d]riving while intoxicated" as "operat[ing] a motor vehicle with a blood alcohol concentration of 0.08% or more").

11

Duragesic, nor did she make any notation in Michelle's chart to alert her practice group that Michelle had been abusing alcohol.

August 2, 2004

Just four days after her release from the hospital, on the morning of August 2, Michelle consumed "half a pint of blackberry red and half a pint of vodka mix." During the day, Michelle told her mother that her back was bothering her and that she had called the pharmacy to fill one half of the Duragesic prescription. (Five patches cost $250 whereas ten cost $500.) Mrs. Komlodi drove her daughter to pick up the prescription. The pharmacist called Dr. Picciano's office to request permission to reduce the number of Duragesic patches from ten to five. A doctor in Dr. Picciano's practice group gave approval, dutifully noting this act in Michelle's chart. Nothing in the chart warned against prescribing fentanyl.

From the pharmacy, Mrs. Komlodi, her two-year-old granddaughter, and Michelle drove to a doctor's office where Mrs. Komlodi had an appointment. Michelle agreed to babysit the toddler in the waiting room. In the reception area, Mrs. Komlodi observed her daughter trying with her teeth to open the package that held one of the Duragesic patches. Michelle asked her mother if she had scissors. Mrs. Komlodi responded that she did not and told her daughter to wait until they returned home. After Mrs. Komlodi left to meet with her doctor, a receptionist

12

noticed that Michelle had passed out.

Dr. Richard Goldstein found Michelle in the waiting room unconscious, blue, not breathing, and without a pulse. Dr. Goldstein and another doctor from the group performed CPR on Michelle. During mouth-to-mouth resuscitation, Dr. Goldstein "found a wadded piece of plastic in [Michelle's] mouth." It was a Duragesic patch.

As a result of the fentanyl overdose, Michelle went into respiratory and cardiac distress, causing a lack of oxygen to the brain. Michelle was taken to Raritan Bay Medical Center and placed on a ventilator for several days. Later, she was released to the JFK Brain Trauma Unit, where she remained for over a month. Michelle suffers from a permanent brain injury with physical deficits; severe cognitive, behavioral, and psychological impairments; and memory loss. At the time of trial, she was a resident at Universal Institute in Long Branch.

D.

Plaintiff's expert, Dr. John Russo, a specialist in internal medicine, testified that Dr. Picciano breached accepted standards of medical care by prescribing to a patient, known to be abusing both alcohol and drugs, a Duragesic patch for back pain without having exhausted typical treatment modalities, such as physical therapy and anti-inflammatory medication. He also maintained that Dr. Picciano deviated from those standards by

13

prescribing the Duragesic patch to treat Michelle's "depression, anxiety, an eating disorder, alcohol withdrawal or detox from alcohol or drugs."

Dr. Russo referred to the Physician's Desk Reference, which warns that the "Duragesic should be used with caution in individuals who have a history of drug or alcohol abuse especially if . . . they are outside a medically controlled environment." He stated that a physician prescribing a Duragesic patch is expected to know that a patient's misuse of the medication can cause respiratory failure and death. Dr. Russo pointedly stated that the standard of care did not allow a physician to "give an addict narcotic medications that [she is] going to abuse." He noted that even in 2004 there were reports of addicts orally ingesting the Duragesic patch. Dr. Russo also explained that after Michelle's episode of binge drinking and her hospitalization for pathological intoxication, Dr. Picciano should have engaged Mrs. Komlodi to assist in keeping Michelle from accessing the prescribed Duragesic. Dr. Russo concluded that Dr. Picciano's prescribing of the Duragesic patch "was a significant contributing factor to the anoxic brain injury" suffered by Michelle.

Defendants' expert, Dr. Mark Graham, also a specialist in internal medicine, testified that Dr. Picciano's treatment of Michelle "was appropriate and within the standards of medical

care." In his opinion, Dr. Picciano understood that Michelle's chronic lower back pain may have been due to "psychiatric problems" and therefore properly referred her to mental health counseling rather than to an orthopedist. Dr. Graham believed that Dr. Picciano made the best choice from "a list of bad options." Dr. Picciano knew that Michelle had hepatitis C and that Michelle's continued use of alcohol to treat her back pain, anxiety, and depression would ruin her liver. Dr. Picciano also knew that if she did nothing Michelle would continue "using drugs off the streets." Therefore, to Dr. Graham's mind, Dr. Picciano's decision to prescribe "a long acting opiate similar to the amount that she was getting from the street" was the safest choice, provided the medication was used properly. Moreover, he stated that not until 2005 did it become general medical knowledge that addicts were consuming Duragesic patches orally. Dr. Graham concluded that nothing Dr. Picciano "did resulted in the adverse outcome" and that if she "prescribed nothing . . . the outcome would likely have been identical to what it was."

E.

The trial court denied the motions of both plaintiff and defendants for a directed verdict. At the charge conference, plaintiff argued that the court should not instruct the jury on apportionment of fault or apportionment of damages between

15

plaintiff and defendants. Plaintiff posited that the standard of care governing Dr. Picciano was the duty "to protect the patient from [her] drug-seeking behavior and the risk of self-inflicted harm whether intentional or unintentional." According to plaintiff, Dr. Picciano had the duty to foresee the consequences of prescribing the medication -- that Michelle's addictive craving would overcome her will and lead her to abuse the Duragesic patch. On that basis, plaintiff submitted that the court should not charge on comparative negligence, increased risk due to a preexisting condition, or avoidable consequences.

On the other hand, defendants essentially argued that those charges were applicable because the jury could find that Michelle was the sole cause of her own tragic condition. From defendants' perspective, Michelle failed to follow the advice of Dr. Picciano to secure mental-health counseling and to use the Duragesic patch for its intended purpose. According to defendants, Michelle's abuse of alcohol for pain relief was destroying her liver, and prescribing the Duragesic was a medically acceptable treatment for her pain. Defendants contended that Michelle chose to abuse the Duragesic patch in a way that could not have been foreseen.

The court decided to charge on preexisting condition, avoidable consequences, and superseding/intervening causation, but not on comparative negligence. In support of its ruling,

16

the court cited Ostrowski v. Azzara, 111 N.J. 429, 441 (1988), which held that trial courts "must avoid the indiscriminate application of the doctrine of comparative negligence (with its fifty percent qualifier for recovery) when the doctrines of avoidable consequences or preexisting condition apply." Under the doctrine of comparative negligence, plaintiff is barred from receiving any recovery if she is more than fifty percent at fault. N.J.S.A. 2A:15-5.1. The court determined that under the doctrine of avoidable consequences, the jury could "consider the conduct of Michelle as an offset to damages" and apportion damages according to each party's percentage of responsibility. The court came to the same conclusion on the theory of increased risk resulting from a preexisting condition. The court determined that the jury should be allowed to consider whether Dr. Picciano's prescribing the Duragesic patch increased the risk due to Michelle's preexisting condition and whether prescribing the patch was a substantial factor in causing Michelle's brain injury. This preexisting-condition charge allowed the jury to deny plaintiff any recovery.

The court submitted to the jury a verdict sheet with ten interrogatory questions broken down into four categories: responsibility, allocation of responsibility, damages, and other factors. The jury's response to the first three questions in the "responsibility" category ended the case. The jury found

17

that plaintiff had proven that Dr. Picciano had deviated from accepted standards of family medical practice and that the deviation increased the risk of harm posed by Michelle's preexisting condition.  However, the jury found that plaintiff did not prove that the increased risk was a substantial factor in producing the medical condition of Michelle Komlodi.  This last response meant that Dr. Picciano did not bear legal fault in causing Michelle's anoxic brain injury and therefore judgment was entered in favor of defendants.

Plaintiff's motion for a new trial or judgment notwithstanding the verdict was denied.

## II.

In an unpublished opinion, a split three-judge panel of the Appellate Division reversed and remanded for a new trial because the trial court incorrectly charged the jury on the law.  The panel maintained that the trial court clearly erred by giving a Scafidi charge.  According to the panel, a Scafidi charge is "'limited to that class of cases in which a defendant's negligence combines with a preexistent condition to cause harm,'" (quoting Verdicchio v. Ricca, 179 N.J. 1, 23–24 (2004)), and the central question in such cases "'is whether [a] plaintiff's damage claim should be limited to the value of the lost chance of recovery,'" (alteration in original) (quoting

Anderson v. Picciotti, 144 N.J. 195, 209 (1996)).  The panel determined that "defendants did not identify 'the preexisting disease and its normal consequences,'" (quoting Fosgate v. Corona, 66 N.J. 268, 272 (1974)), and therefore "were not entitled to a Scafidi charge."  It also determined that the trial court's vague references to Michelle's "'medical condition' and 'her problems'" were not a sufficient articulation of a preexisting condition without tying it "to any proofs or theories presented by the parties."

The panel also stated that the trial court erred in instructing the jury on both "but for" causation and "substantial factor" causation in referring to the "preexisting condition/increased risk."  It found that those two forms of causation are incompatible and that a "but for" causation charge is not appropriate where concurrent causes may be responsible for the harmful result.

In addition, the panel stated that there was "no reason for the court to instruct the jury on both foreseeability and intervening cause," for if Michelle's purposeful misuse of the Duragesic patch was "foreseeable," then the drug abuse would not be "a superseding cause that relieves Dr. Picciano from negligence."

On the other hand, the panel rejected plaintiff's argument that the court should not have instructed the jury on the

doctrine of avoidable consequences. The jury, it determined, could have concluded that Michelle had a duty to "mitigate[] damages by following" Dr. Picciano's instructions.

In his dissent, Judge Ashrafi countered that "Michelle Komlodi's drug addiction was irrefutably a preexisting condition that was a proximate cause of her ingestion of the injurious fentanyl gel . . . [causing] the brain injury she suffered." He acknowledged that "the trial court erred by including a 'but for' proximate cause charge in the context of a case involving alleged multiple causes of plaintiff's injuries." He nevertheless considered this "isolated misstep" not capable of producing an unjust result in the context of a lengthy jury charge. On the question of foreseeability and superseding/intervening causation, Judge Ashrafi also disagreed with the majority, stating that "[b]oth instructions were proper statements of the law for the jury to consider in determining defendant's liability." In his opinion, "[t]he jury's verdict was based on the evidence and on correct instructions as a whole," and accordingly there was no justification to reverse the no-cause verdict.

Defendants filed an appeal as of right pursuant to Rule 2:2-1(a).[5] The issues before us are limited to those raised in

_____

[5] Neither party filed a petition for certification challenging a ruling of the Appellate Division not raised in the dissent.

20

the dissent.  R. 2:2-1(a)(2) ("Appeals may be taken to the Supreme Court from final judgments as of right . . . with regard to those issues as to which, there is a dissent in the Appellate Division . . . ."); Gilborges v. Wallace, 78 N.J. 342, 349 (1978) ("[W]here there is a dissent in the Appellate Division, the scope of the appeal . . . is limited to those issues encompassed by the dissent.").  We granted the motion of the New Jersey Association for Justice (NJAJ) to participate as amicus curiae.

III.

A.

Defendants contend that Dr. Picciano did not deviate from the appropriate standard of care when she prescribed a Duragesic patch for Michelle Komlodi, but even if she did, Michelle caused the harm -- an anoxic brain injury -- by ingesting the patch. On either theory, defendants insist, they have no legal liability.  Defendants argue that the trial court properly gave a Scafidi charge because Michelle had a preexisting drug and alcohol addiction, and if Dr. Picciano increased the risk of harm by prescribing a powerful medication for Michelle's "unremitting back pain," it was Michelle's "craving for narcotics [that] overcame the valid use of the Duragesic patch." In defendants' view, Scafidi applies when negligent medical

21

treatment exacerbates a preexisting condition, leading to "a result which could be foreseeable from that pre-existing condition."  Thus, the Scafidi charge was proper because "[t]he pre-existing condition, drug addiction, combined with the prescription of a narcotic for back pain, led to a result that was foreseeable."  According to defendants, the role of the jury was to determine whether either Dr. Picciano's treatment or Michelle's preexisting condition was a substantial factor causing the anoxic brain injury, and if both were factors to apportion damages.  Defendants state that "judicial notice can be taken that addicts often overdose, usually unintentionally, by accidentally consuming a narcotic or more narcotics than that individual intended."

Defendants also maintain that the errant "but for" language in the jury charge was harmless, for the reasons given by Judge Ashrafi.  Last, they submit that the trial court's charge on both superseding/intervening causes and foreseeability was a proper statement of law.

B.

Plaintiff claims that this was a case of simple negligence and therefore the Scafidi charge was improper for two reasons. First, Dr. Picciano breached the standard of care by prescribing a Duragesic patch to treat the lower back pain of a patient with a history of drug and alcohol abuse, and it was foreseeable that

22

Michelle would misuse the patch either by orally ingesting it or using it while drinking alcohol. Second, Dr. Picciano was negligent because, after prescribing the patch and learning that Michelle was abusing alcohol, she did not "take appropriate measures to assure that Michelle would not use the patch."

Plaintiff maintains that a Scafidi case is one in which a doctor negligently treats a preexisting disease, thereby increasing the harm caused by the preexisting disease. In such a case "the Scafidi charge is warranted and the plaintiff's damages are limited to the increased risk of harm attributable to the defendant's negligent conduct." Here, according to plaintiff, Scafidi does not apply because Dr. Picciano was treating Michelle for lower back pain and not for the preexisting disease of alcohol or drug addiction. In plaintiff's view, even if Scafidi principles applied, defendants failed "to identify the pre-existing condition and reasonably apportion the damages" and did not satisfy those principles merely by insisting that the anoxic brain injury would have occurred anyway "because a drug addict can overdose at any time." Last on this issue, plaintiff contends that because defendants offered no evidence on apportionment of damages, they were totally responsible for the injury and damages.

Plaintiff also claims that the "but for" instruction was improper in a case "where there are concurrent or intervening

causes of harm that do not constitute pre-existing medical conditions that the defendant is treating."  Finally, she urges that charging superseding/intervening causation was improper because defendants conceded that abuse of the Duragesic patch was foreseeable, and therefore such a charge could only have served to confuse the jury.

C.

Amicus curiae NJAJ also submits that the trial court erred in giving a <u>Scafidi</u> charge.  NJAJ states that this case is not the "typical <u>Scafidi</u> fact pattern" in which a doctor negligently delays medical treatment of a patient afflicted by a preexisting disease, leading to an increased risk of harm to the patient. In such a case, the preexisting condition itself may lead to a harmful result, and the doctor's negligence accelerates or fails to stem the course of the condition.  Here, NJAJ asserts Dr. Picciano's "deviation from the standard of care alone is the cause of Michelle's injuries," thus rendering inapplicable a <u>Scafidi</u> charge.  Further, NJAJ insists that "the trial court erred in failing to tailor the charge to the theories and facts presented by plaintiffs at trial" and that the "but for" charge was so confusing that it fatally undermined the fairness of the verdict.

IV.

24

A.

In this medical malpractice case, the parties presented dueling theories on standard of care and causation and hotly disputed what inferences should be drawn from the facts. The jury, as the ultimate trier of fact, was presented with the task of deciding exceedingly complex issues of liability and apportionment of damages. But a jury cannot fulfill that difficult task without accurate, clear, and understandable instructions from the court. Jurman v. Samuel Braen, Inc., 47 N.J. 586, 591-92 (1966) ("[T]he court's instructions must . . . set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them . . . ."). The faithful performance of the jurors' duties depends on proper guidance from the court. Talmage v. Davenport, 31 N.J.L. 561, 562 (1864). Indeed, the trial court must tailor the instructions on the law to the theories and facts of a complex case for a jury to fully understand the task before it. See Reynolds v. Gonzalez, 172 N.J. 266, 288-89 (2002) (reversing medical-malpractice verdict for "trial court's failure to tailor its instruction to the theories and facts presented").

In a medical-malpractice action, the plaintiff has the burden of proving the relevant standard of care governing the

25

defendant-doctor, a deviation from that standard, an injury proximately caused by the deviation, and damages suffered from the defendant-doctor's negligence.  See Verdicchio, supra, 179 N.J. at 23; Evers v. Dollinger, 95 N.J. 399, 406 (1983) (reversing judgment in favor of defendant because evidence that tumor increased in size satisfied plaintiff's requirement to prove damages).  In medical malpractice cases, the standard of care generally is not a matter of common knowledge and must be established by experts who typically specialize in a field of medicine similar to that of the defendant-physician.  Nicholas v. Mynster, 213 N.J. 463, 479 (2013) (noting that in malpractice cases generally "'an expert must have the same type of practice and possess the same credentials, as applicable, as the defendant health care provider'" (quoting Assem. Health & Human Servs. Comm., Statement to Assem. B. 50 at 20 (Mar. 4, 2004))).  A physician must exercise a duty of care to a patient that, generally, any similarly credentialed member of the profession would exercise in a like scenario.  Cowan v. Doering, 111 N.J. 451, 462, 468 (1988).  In certain circumstances -- depending on the condition a patient presents -- the duty of care may "include the duty to prevent a patient from engaging in self-damaging acts."  Id. at 461 (finding duty of care to prevent suicidal patient from self-inflicting harm based on foreseeable risk that patient would try to injure herself).  We have held

26

that a psychiatrist treating a suicidal patient may have a duty to protect the patient from self-harm. Cowan, supra, 111 N.J. at 462. A health-care provider may also have a duty to protect a particularly vulnerable patient from self-harm. See Tobia v. Cooper Hosp. Univ. Med. Ctr., 136 N.J. 335, 342 (1994) (stating in case involving elderly woman who fell off hospital stretcher that it is wrong "to suggest to the jury that although the hospital had the duty to care for an incapacitated patient, the patient's lack of care for herself diluted that duty"). We have noted that in cases involving the foreseeability that a patient will engage in self-injurious conduct, application of comparative negligence may dilute the duty of care. Tobia, supra, 136 N.J. at 342; Cowan, supra, 111 N.J. at 467.

In this case, plaintiff and defendants presented conflicting expert testimony concerning whether Dr. Picciano deviated from the accepted standard of care. The parties do not truly dispute that a "duty of care to prevent self-inflicted harm arises" when there is "a foreseeable risk that plaintiff's condition, as it [is] known to defendants, include[s] the danger that she [will] injure herself." Cowan, supra, 111 N.J. at 462. They dispute whether Dr. Picciano breached this standard. Plaintiff argued that prescribing a Duragesic patch to a drug- and alcohol-addicted patient, given the ongoing history presented by Michelle Komlodi, deviated from the applicable duty

27

of care.  Defendants argued that Dr. Picciano prescribed the patch as a stop-gap measure to treat Michelle's pain so that she would not self-medicate while she was waiting for her appointment at a mental-health clinic.

In rendering its verdict, the jury pronounced in interrogatory number one that Dr. Picciano deviated from the standard of care governing a family-practice physician.  That finding is not directly at issue in this appeal.  The main focus is on the propriety of the charge on causation.

With this background, we now turn to the various theories of causation that are at the heart of this appeal.

B.

A basic notion of our law is that, generally, a tortfeasor should be liable for only the harm she actually caused to the plaintiff.  Scafidi, supra, 119 N.J. at 112-13.  In cases where a plaintiff is responsible, in whole or in part, for the harm or injury she suffers, the doctrines of comparative negligence, avoidable consequences, or superseding/intervening causation may serve to absolve a defendant of liability or limit her damages.  See Ostrowski, supra, 111 N.J. at 436-38 (discussing elements of comparative negligence and avoidable consequences); Cowan, supra, 111 N.J. at 465 (stating that defendant has no liability if there is intervening act that breaks chain of causation).  Another doctrine -- the one specifically at issue in this case -

- provides a limitation on liability or damages in a medical malpractice action when a defendant-physician fails to timely treat or diagnose a preexisting disease or condition, thus increasing the risk of harm to the plaintiff.  Scafidi, supra, 119 N.J. at 112 (limiting plaintiff's damages in preexisting disease or condition cases "to the value of the lost chance of recovery").  So, for example, the physician who fails to timely detect a progressive disease, such as cancer, is only liable for the damages caused by the increased risk of harm resulting from her negligence.  See id. at 112-13.  In a case involving a preexisting disease or condition, the defendant-physician, not the "innocent" patient, is required to establish the percentage of damages attributable to the physician's negligence.  Verdicchio, supra, 179 N.J. at 37 (quoting Fosgate, supra, 66 N.J. at 272).

Following this Court's guidance in Ostrowski, supra, the trial court in this case decided against charging comparative negligence.  The comparative-negligence statute permits recovery, and apportionment of damages, so long as the plaintiff's "negligence was not greater than the negligence of the person against whom recovery is sought."  N.J.S.A. 2A:15-5.1.  Under the statute, if the plaintiff's negligence is fifty-one percent and defendant's forty-nine percent, the plaintiff receives no recovery.  Comparative negligence "comes into action

when the injured party's carelessness occurs <u>before</u> defendant's wrong has been committed or concurrently with it." <u>Ostrowski</u>, <u>supra</u>, 111 <u>N.J.</u> at 438 (citing William L. Keeton et al., <u>Prosser and Keeton on the Law of Torts</u> § 65 at 458-59 (5th ed. 1984)).

In contrast to comparative negligence, the doctrine of avoidable consequences "normally comes into action when the [plaintiff's] carelessness occurs <u>after</u> the defendant's legal wrong has been committed." <u>Id.</u> at 438. Unlike comparative negligence, the doctrine of avoidable consequences is not a defense to liability and serves only to mitigate damages. <u>Id.</u> at 441 (quoting <u>Southport Transit Co. v. Avondale Marine Ways, Inc.</u>, 234 <u>F.</u>2d 947, 952 (5th Cir. 1956)). Avoidable consequences will reduce a recovery because a plaintiff cannot claim as damages the additional injury she causes to herself after a defendant commits a tortious act. <u>See</u> <u>ibid.</u> A plaintiff whose broken wrist is wrongly set by a surgeon cannot claim increased damages when, against doctor's orders, she causes additional harm to her wrist while playing tennis.

Thus, even when comparative negligence is barred, "[d]efendants can assert a patient's self-neglect to limit damages." <u>Tobia</u>, <u>supra</u>, 136 <u>N.J.</u> at 343 (stating that if plaintiff, after having fallen off stretcher, had worsened her condition by disobeying medical instructions, jury could find failure to mitigate damages); <u>see also</u> <u>Ostrowski</u>, <u>supra</u>, 111

N.J. at 449 (noting that diabetic patient's "continued failure to follow dietary and smoking rules" could be considered failure to mitigate damages but not comparative negligence); Lynch v. Sheininger, 162 N.J. 209, 230 (2000) (noting in wrongful birth claim that trial court might be required to charge avoidable consequences if "proofs would sustain a jury finding that the [parents] decided to conceive another child notwithstanding their knowledge" that pregnancy was likely to be risky).

In the present case, plaintiff ingested the Duragesic patch after Dr. Picciano allegedly violated the standard of care by prescribing the patch. In Ostrowski, supra, we said that courts "must avoid the indiscriminate application of the doctrine of comparative negligence . . . when the doctrines of avoidable consequences or preexisting condition apply." 111 N.J. at 441. Based on this instruction, the trial court ruled out comparative negligence as a defense. The court's decision not to charge comparative negligence was not appealed. By its clear terms, Ostrowski signaled that a comparative negligence charge should not be given when the doctrine of avoidable consequences applies. However, it is also clear here that giving a preexisting disease or condition charge was inappropriate.

C.

In light of the charges on avoidable consequences and superseding/intervening causes, the trial court erred in

31

charging the jury on preexisting disease or condition -- the Scafidi charge.  We come to that conclusion for several reasons.

When a patient is treated for a preexisting condition and a physician's negligence worsens that condition, it may be difficult to identify and prove the precise injury caused by the physician.  See Evers, supra, 95 N.J. at 413.  To address this scenario, we have held that a jury must decide whether any "negligent treatment increased the risk of harm posed by a preexistent condition" and, if so, "whether the increased risk was a substantial factor in producing the ultimate result." Scafidi, supra, 119 N.J. at 108.  If the plaintiff satisfies her burden of proving these two elements by a preponderance of the evidence, then the burden shifts to the defendant to show what damages should be attributable solely to the preexisting condition as opposed to the physician's negligence.  See Fosgate, supra, 66 N.J. at 272-73.  The amount of damages caused by the aggravation of the preexisting condition due to the physician's negligence is "the value of the lost chance of recovery."  Scafidi, supra, 119 N.J. at 112.  The jury instruction on whether the doctor's deviation from the standard of care increased the risk of harm and whether the increased risk was a substantial factor in producing the ultimate harm -- along with the allocation of damages -- is known as a Scafidi or preexisting-condition charge.  See id. at 108-09.

32

One important distinction between the doctrine of preexisting disease and condition and the doctrines of comparative negligence, superseding/intervening cause, and avoidable consequences is that preexisting disease and condition does not involve fault on the part of the plaintiff. Ostrowski, supra, 111 N.J. at 438 ("[T]he injured person's conduct is irrelevant to the consideration of the doctrine of aggravation of a preexisting condition."); id. at 437 (stating that under comparative negligence plaintiff is barred from receiving recovery when her fault is greater than defendant's); id. at 443 (stating that under avoidable consequences plaintiff's recovery is reduced by degree of her fault as expressed by percentage); Cowan, supra, 111 N.J. at 465 (stating that plaintiff's volitional act may constitute superseding/intervening cause barring recovery).

In the typical Scafidi case, the plaintiff seeks treatment for a preexisting condition, and the physician, through negligence, either fails to diagnose or improperly treats the condition, causing it to worsen and sometimes causing the plaintiff to lose the opportunity to make a recovery. See, e.g., Reynolds, supra, 172 N.J. at 275 (failure to conduct appropriate test increased risk of nerve damage and paralysis from undiagnosed and untreated condition); Scafidi, supra, 119 N.J. at 98 (failure to properly treat premature labor resulted

in early birth and death of infant); Evers, supra, 95 N.J. at 404 (delay in treating breast cancer "enhanced the risk that the cancer would recur"). Scafidi-type cases generally do not implicate fault on the part of the plaintiff. The physician must take the patient as presented to her and cannot blame the patient for the preexisting condition or disease for which the patient has sought treatment.

Thus, in the typical Scafidi case, the inexorable progression of a preexisting disease or condition will occur due to no fault of the plaintiff, and it is that circumstance that will be offset against a treating physician's negligence. Here, it is Michelle's failure to properly use the Duragesic patch after Dr. Picciano's alleged negligence -- prescribing the patch -- that is at issue. Because the Scafidi charge here was used to allocate fault, not just damages, it served as a substitute for the comparative-fault charge -- without the fifty-one percent fault bar. Moreover, the Scafidi charge here became blurred with the charge on avoidable consequences and superseding/intervening causation. Defendants' basic argument in summation was that Michelle chose to misuse the Duragesic after Dr. Picciano prescribed the patch. Stated differently, Michelle could have avoided the consequence of Dr. Picciano's alleged negligence by properly using the patch. Notably, defendants argue before this Court that Scafidi was appropriate

because Michelle's injury was foreseeable given her preexisting condition; yet at trial, defendants argued to the jury that Dr. Picciano could not have foreseen Michelle's superseding/intervening actions. These inconsistent arguments strongly suggest that the charge had the capacity to confuse or mislead the jury.

In addition, the Scafidi charge suffered from multiple defects. The court merely recited several interrogatory questions on the jury verdict form without elaboration or further guidance. The first three interrogatory questions read:

> 1) Did plaintiff prove by a preponderance of the evidence that Anne Picciano, M.D., deviated from accepted standards of family medical practice?
>
> 2) Did plaintiff prove by a preponderance of the evidence that the deviation by Dr. Picciano increased the risk of harm posed by Michelle Komlodi's pre-existing condition?
>
> 3) Did plaintiff prove by a preponderance of the evidence that that increased risk was a substantial factor in producing the medical condition of Michelle Komlodi?

These three questions, and a fourth that allowed an allocation of damages if the jury answered affirmatively to the first three, were the entirety of the court's Scafidi charge.

The trial court did not follow Model Jury Charge (Civil) § 5.50E entitled, "Pre-Existing Condition -- Increased Risk/Loss of Chance -- Proximate Cause" (Feb. 2004). That charge requires

35

that the principles of law be charged with reference to the specific facts of the case. The charge instructs the trial court to provide "a detailed factual description of the case." Model Jury Charge (Civil) § 5.50E. That was not done here. The charge also indicates that the preexisting condition or disease should be identified. That was not done here. For example, the Model Jury Charge reads:

> If you determine that the defendant was negligent, then you must also decide what is the chance that: [(1) the plaintiff would not be dying of cancer; or (2) the plaintiff's husband would not have died of the heart attack et cetera], if the defendant had not been negligent. . . .
>
> When the plaintiff came to the defendant, he/she had a preexisting condition [here describe the condition, e.g., breast cancer; heart attack et cetera] which by itself had a risk of causing the plaintiff the harm he/she ultimately experienced in this case.
>
> [Ibid.]

As is evident from the model charge, in instructing the jury, the trial court is expected to review facts relevant to the charge and to identify the preexisting disease or condition. Had the court attempted to do so, the inadvisability of giving the charge might have become apparent. However, even if the charge were appropriate, the failure to tailor the legal theories and facts to the law on preexisting conditions would raise serious questions about the verdict. Reynolds, supra, 172

36

N.J. at 288-89.  "'[E]rroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error.'"  Das v. Thani, 171 N.J. 518, 527 (2002) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)).

We agree with the panel majority that the misapplication of the Scafidi charge requires a remand for a new trial.


V.

We concur with Judge Ashrafi's dissent that the trial court did not err in charging the jury on both foreseeability and superseding/intervening causation.  The panel majority was correct in asserting that "if Michelle's deliberate act was foreseeable, then it was not a superseding cause."  That, however, is not a sufficient reason for not instructing on superseding/intervening causes.  The concepts of foreseeability and superseding/intervening causation are inextricably interrelated, and the jury needs to be educated to have a full understanding of both.  Here, as in other parts of the charge, the trial court failed to explain to the jury how the legal concepts applied to the facts of the case.

A.

Foreseeability is a constituent part of proximate cause, and proximate cause is an essential element of a malpractice action.  If an injury is not a foreseeable consequence of a

37

person's act, then a negligence suit cannot prevail.  See Caputzal v. Lindsay Co., 48 N.J. 69, 78-79 (1966) (noting that there is no liability for "remote consequences" of negligent action).  An act is foreseeable when a reasonably prudent, similarly situated person would anticipate a risk that her conduct would cause injury or harm to another person.  Kelly v. Gwinnell, 96 N.J. 538, 543 (1984) (citing Rappaport v. Nichols, 31 N.J. 188, 201 (1959)).  So long as the injury or harm suffered was within the realm of reasonable contemplation, the injury or harm is foreseeable.  Bendar v. Rosen, 247 N.J. Super. 219, 229 (App. Div. 1991) ("The tortfeasor need not foresee the precise injury; it is enough that the type of injury be within an objective 'realm of foreseeability.'" (citation omitted)).  In contrast, if an injury or harm was so remote that it could not have been reasonably anticipated, the injury or harm is not foreseeable.  See Caputzal, supra, 48 N.J. at 78-79.

The superseding/intervening charge complements the general charge on proximate cause.  Indeed, the interrelationship between foreseeability and superseding/intervening causes is recognized by our Model Jury Charges.  Model Jury Charge (Civil) § 6.13, "Proximate Cause -- Where There Is Claim That Concurrent Causes of Harm Are Present and Claim That Specific Harm Was Not Foreseeable" (May 1998), specifically notes that, when appropriate, it should be charged with Model Jury Charge (Civil)

§ 6.14, "Where There Is Claim of Intervening or Superseding Cause for Jury's Consideration" (Aug. 1999).

A superseding or intervening act is one that breaks the "chain of causation" linking a defendant's wrongful act and an injury or harm suffered by a plaintiff. Cowan, supra, 111 N.J. at 465. A superseding or intervening act is one that is "the immediate and sole cause of the" injury or harm. Model Jury Charge (Civil) § 6.14; see also Davis v. Brooks, 280 N.J. Super. 406, 412 (App. Div. 1993). Significantly, intervening causes that are "foreseeable" or the "normal incidents of the risk created" will not break the chain of causation and relieve a defendant of liability. Model Jury Charge (Civil) § 6.14; see also Rappaport, supra, 31 N.J. at 203.

As with all disputed issues, the jury is the final arbiter of the facts. Thus, whether a particular risk is foreseeable and whether the act of another is one of the "normal incidents of the risk created" are issues for the jury. See Rappaport, supra, 31 N.J. at 203.

Cowan, supra, provides one illustration of superseding/intervening causation in a medical malpractice case. 111 N.J. at 465-66. In that case, at defendant Valley Hospital, the defendant doctors and nurses treated the plaintiff, who had attempted suicide by overdosing on sleeping pills. Id. at 455. At some point, the plaintiff was placed in a room, the door was

closed, and she was not monitored, contrary to hospital policy. Id. at 456. The plaintiff managed to jump out of the window of her room, falling twelve feet and injuring herself. Ibid. We upheld the trial court's instruction on superseding/intervening causation. Id. at 465. We noted that the plaintiff's "leap from the window" might break the chain of causation "if her act were volitional and not attributable to her disorder or condition." Ibid. "The issue fairly presented to the jury was whether the leap was reasonably foreseeable or was, on the contrary, a remote or abnormal incident of the risk of self-injury that was not otherwise reasonably foreseeable by defendants." Ibid. (citing Rappaport, supra, 31 N.J. at 203–04). It was left to the jury to determine whether the plaintiff was able to exercise reasonable care given her underlying condition. Id. at 466. We upheld "the jury's rejection of the intervening causation" because the evidence "fully supported" the finding that "it was clearly foreseeable that defendants' conduct created a risk that plaintiff would engage in self-damaging acts." Ibid.

We now apply these principles to the case before us.

B.

Here, the jury had to determine whether, given Michelle Komlodi's medical history of addiction to alcohol and drugs, her oral ingestion of the Duragesic patch was "reasonably

40

foreseeable or was . . . a remote or abnormal incident of the risk of self-injury that was not otherwise reasonably foreseeable by defendants." Cowan, supra, 111 N.J. at 465. Intertwined with that question was whether Michelle's act was "volitional and not attributable to [her] disorder or condition." Ibid. Were Michelle's addictive cravings so powerful that they were capable of overcoming her will, and would a reasonably prudent, similarly credentialed physician have understood this dynamic? In light of Michelle's apparently proper, although illicit, topical use of the Duragesic patch in the past, was it reasonably foreseeable that Michelle would orally ingest the prescribed Duragesic? Was there common knowledge among family care practitioners about the potential abuses of Duragesic patches at the times relevant in this case? What would a reasonably well-informed doctor have anticipated given the patient's medical history and prior conduct? We do not suggest that these precise questions had to be framed for the jury. The court here, however, never posed any appropriate superseding/intervening causation questions. Instead, the court gave examples completely unrelated to the proofs.

The trial court was correct to charge the jury on superseding/intervening cause. But it did not mold its instructions to the facts of this case. Juries must know how the legal instructions are to be applied to the complex factual

scenarios before them, and the instructions must be clear and understandable. The jury charge failed to give the jury the guidance it needed to sort through the complex issues in this case.

VI.

Neither plaintiff nor defendant has challenged the avoidable-consequences charge given at trial; nevertheless, our review of the avoidable-consequences charge leads us to the conclusion that it must be adapted to the special circumstances of this case. As with all jury instructions, the trial judge should tailor the charge to the facts and the parties' arguments. Model Jury Charge (Civil) § 8.11B, "Duty to Mitigate Damages by Medical and Surgical Treatment," will only be meaningful to a jury hearing this case if it addresses the special circumstances presented here -- how plaintiff acted in light of her drug and alcohol addiction. The jury must determine whether, and to what degree, the plaintiff had the capacity to act reasonably to care for herself in light of her health or mental condition. See Cowan, supra, 111 N.J. at 460. We recommend the following charge:

> Plaintiff contends that because of Michelle's impaired health or mental condition, defendant had the duty to protect Michelle from harming herself. If you

decide that plaintiff is entitled to damages for Michelle's injuries, you then must decide whether Michelle had the capacity to exercise reasonable care to avoid or mitigate the damages she suffered.

A plaintiff is responsible for mitigating the consequences of a defendant's negligent conduct to the extent reasonable care can be exercised by the plaintiff, taking into consideration her health or mental condition.

In this case, defendant claims that Michelle could have avoided or mitigated her injuries by securing mental health treatment or by using the Duragesic patch as instructed. On the other hand, plaintiff claims that Michelle was so impaired by her addiction that she was incapable of caring for herself, that is, incapable of avoiding or mitigating her injuries. You, members of the jury, must decide the facts, and ultimately which of the party's arguments is most persuasive, or whether there is some merit to both, and if so to what degree.

In short, you must decide what percentage, if any, of Michelle's damages were caused by a failure on her part to exercise reasonable care to avoid or mitigate those damages -- provided she was capable of doing so. If she was capable of doing so, you must reduce her damages accordingly.

Whether a plaintiff acted reasonably must be examined in light of the plaintiff's capacity to care for herself. A plaintiff suffering from a health or mental condition may be capable, incapable or not fully capable of caring for herself as an ordinary person would.

If you find that plaintiff has established defendant's negligence, then defendant must prove by a preponderance of the evidence that Michelle, in light of her health or

43

mental condition, could reasonably have acted to avoid or mitigate injury.

A defendant is liable only for that portion of the injuries attributable to the defendant's negligence. If you find that, in light of her health or mental condition, Michelle did not act reasonably to avoid or mitigate injury, you must assess the degree to which the injuries were the result of either defendant's negligence or Michelle's own unreasonable failure to avoid or mitigate injury. You must allocate by percentages defendant's responsibility for Michelle's injuries and Michelle's failure to exercise care to avoid or mitigate those injuries.[6]

## VII.

The appellate panel majority and the dissent agree that the use of a "but for" causation charge in conjunction with a substantial-factor charge was error. Unlike the majority, however, the dissent concluded that the error was harmless. The trial court made a seemingly inadvertent reference to "but for" causation during its instruction on proximate cause.

So, first you must find that the resulting injury would not have occurred but for Dr. Picciano's negligent conduct.

Second, you must find that the negligent conduct was a substantial factor in bringing about the resulting injury. If you find that Dr. Picciano's negligence was a cause of the injury and was a substantial

---

[6] We refer to the Supreme Court Committee on Model Civil Jury Charges, for its review, the charge on avoidable consequences for any recommendations it may have for its improvement, bearing in mind the various scenarios to which it may apply.

> factor in bringing about the injury, that negligence was a proximate cause of the injury.

This was the only reference to "but for" causation in the charge. Importantly, no party objected to the "but for" reference. See R. 1:7-2 ("Except as otherwise provided by R. 1:7-5 and R. 2:10-2 (plain error), no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto . . . .").

These two forms of causation -- "but for" and "substantial factor" -- are mutually exclusive. A "but for" charge is appropriate when there is only one potential cause of the injury or harm. See Conklin v. Hannoch Weisman, P.C., 145 N.J. 395, 417 (1996) ("In the routine tort case, 'the law requires proof that the result complained of probably would not have occurred "but for" the negligent conduct of the defendant.'" (citation omitted)). In contrast, the "substantial factor" test is given when there are concurrent causes potentially capable of producing the harm or injury. Id. at 419-20. Thus, "a tortfeasor will be held answerable if its 'negligent conduct was a substantial factor in bringing about the injuries,' even where there are 'other intervening causes which were foreseeable or were normal incidents of the risk created.'" Brown v. United States Stove Co., 98 N.J. 155, 171 (1984) (quoting Rappaport, supra, 31 N.J. at 203). A substantial factor is one that is

45

"not a remote, trivial or inconsequential cause." Model Jury Charge (Civil) § 6.13.

We have determined that there must be a new trial because of the erroneous inclusion of the Scafidi charge. At the new trial, the jury charge must explain the parties' legal theories and the proofs in relation to the governing law. In addition, the substantial-factor test will be the test for deciding proximate cause.

## VIII.

For the reasons explained, we affirm and modify the judgment of the Appellate Division. Accordingly, the no-cause verdict is vacated, and a new trial is ordered. This matter is remanded to the Law Division for proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA and PATTERSON and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE ALBIN's opinion.

46

SUPREME COURT OF NEW JERSEY

NO.   A-13                           SEPTEMBER TERM 2012

ON APPEAL FROM        Appellate Division, Superior Court


JUDY KOMLODI, as Guardian for
MICHELLE KOMLODI, an
Incapacitated person,

        Plaintiff-Respondent,

                v.

ANNE PICCIANO, M.D. and JFK
MEDICAL CENTER,

        Defendants-Appellants.


DECIDED            May 20, 2014

                   Chief Justice Rabner                PRESIDING
OPINION BY      Justice Albin

CONCURRING/DISSENTING OPINION BY
DISSENTING OPINION BY


| CHECKLIST | AFFIRM AS MODIFIED/ VACATE/ REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| | 6 | |

1